**UNITED STATES of America**

v.

**Raymond J. PATRIARCA.**

**Cr. No. 89–289–WF.**

United States District Court,
D. Massachusetts.

Aug. 19, 1992.

See also 776 F.Supp. 593; 948 F.2d 789.

Jeff Auerhahn, James Herbert and Gregg Sullivan, Asst. U.S. Attys., New England Organized Crime Strike Force, Dept. of Justice, Boston, MA, for plaintiff.

Oteri, Weinberg & Lawson, Martin G. Weinberg, Boston, MA, John F. Cicilline, Providence, RI, for defendant Raymond Patriarca.

Balliro, Mondano & Balliro, Joseph J. Balliro, Boston, MA, Henry D. Katz, Chelsea, MA, for defendant Robert Carrozza.

Elliot M. Weinstein, Boston, MA, for defendant Dennis Lepore.

Joseph Russo, pro se.

## ORDER

WOLF, District Judge.

Attached is a memorandum based upon the transcript of the decisions rendered orally on June 16, 1992, regarding the objections to the Presentence Report of the defendant Raymond J. Patriarca. This memorandum adds citations to the law and the evidence; deletes for publication colloquy and other non-essential remarks (with such deletions noted by asterisks); clarifies some language; and adds footnotes amplifying three points made orally. The Court recommends this memorandum as the most accurate and complete statement of the reasons for the decisions rendered on June 16, 1992. The transcript of the proceedings on June 16, 1992 is also being prepared and may be obtained from the court reporter.

The transcript of the proceedings on June 17, 1992 shall constitute the record of the reasons for the denial of the Government's Motion to Reconsider, filed after the court's rulings on June 16, 1992. The June 17, 1992 transcript may also be obtained from the court reporter.

## CONTENTS

Summary 167

Factual Context 170

Procedural History 174

The Travel Act Violations 179

The Scope of the Defendant's Relevant Conduct 185

Departures 196

---

### I. *Summary.*

We are here today pursuant to my order of June 9, 1992, in which I stated that the Court intends to rule orally on the parties' objections to the defendant Raymond J. Patriarca's Presentence Report and if the rulings indicate that it is not appropriate for the Court to hear further testimony, to sentence the defendant.

\* \* \* \* \* \*

After a brief preamble, I will alleviate any avoidable suspense and summarize in some detail where all this comes out. However, as I think the number of people in the courtroom reflects the evident public interest in this, I ought to say the following by way of introduction.

We are here today for the defendant's sentencing under the Guidelines promulgated by the United States Sentencing Commission. The use of the word "Guidelines" in this context, however, may be somewhat misleading to the uninitiated. Usually, guidelines give guidance. The Guidelines here are laws that relate to sentencing. They both define and limit the discretion that the court has in imposing sentence in this case. The Guidelines are intended in part to eliminate what was regarded as unwarranted disparity; that is, differences in sentencing that were due to the differences between judges, either in the same courthouse or in different parts of the country, rather than based on meaningful distinctions concerning the offender or the offense. *See* 28 U.S.C. § 991(b)(1)(B).

As this proceeding has indicated, however, the Sentencing Guidelines have not ren-

dered sentencing mechanical. Judges, including me in this case, are called upon to interpret ambiguous provisions of the Guidelines and to resolve factual disputes that are material to the sentence that is to be imposed. As this proceeding also demonstrates, at times that can be a challenging and time-consuming process. However, once those decisions are reached, the court must impose a sentence authorized by the Guidelines.

In addition, as part of an effort to put greater truth in sentencing, when the Sentencing Guidelines came into effect, the possibility of parole for a convicted defendant was eliminated. *See* 18 U.S.C. §§ 4201–4218, "United States Parole Commission," *repealed by* Sentencing Reform Act of 1984, Pub.L. No. 98–473, Title II, Ch. II, § 218(a)(5). Therefore, Patriarca, like other defendants sentenced under the Guidelines, will be required to serve substantially all of the term of imprisonment that I impose on him.

Finally by way of introduction, I would say that it should be recognized that the Guidelines that are contained in the United States Sentencing Commission Guidelines Manual establish a system which includes 43 Offense Levels that go up and down on a grid and six Criminal History Categories that go horizontally on that grid. However, while that looks like a mathematical grid, it ends up setting a range of reasonable sentences that can be imposed under the Guidelines as calculated. In other words, there is no one sentence which the Sentencing Commission established as precisely correct.

Now, with regard to the summary of the many rulings I will explain in detail, in the Presentence Report, the Probation Department analyzed the facts and the applicable laws as it then understood them and calculated the defendant's Guidelines to be an Offense Level 26, Criminal History Category I, providing for a sentence of 63 to 78 months.

The government and the defendant each had a number of objections to these calculations. I have resolved all of the objections. I find that the proper calculation of the defendant's Guidelines place him in an Offense Level 27, with a Criminal History Category of II, and that the permissible range for his sentence is 78 to 97 months. At the end of this proceeding, the parties will have an opportunity to argue where within that range Patriarca's sentence should fall.

Basically, the decisions I have made which result in this calculation are as follows.

There are three disputes relating to three Travel Act counts concerning Patriarca. Count 31 involves the August 1985 travel concerning Robert Carrozza's desire to replace Henry Tameleo as the person Frank Mantia would be required to pay with regard to certain loansharking debts. I find that the Offense Level for Count 31 is properly placed at Level 20 because the travel related to extortion.

Carrozza's possible intention to use money from Mantia to buy drugs is not relevant conduct attributable to the defendant, as the government now contends, because such narcotics activity was neither within the scope of the Count 31 Travel Act conspiracy between the defendant and Carrozza, nor a reasonably foreseeable consequence of it. The government has failed to prove by a preponderance of the evidence that Carrozza's narcotics activity, or alleged narcotics activity, constitutes relevant conduct attributable to Patriarca.

Thus, with regard to Count 31, the rating is not a Level 30 as the government has recently contended, or a Level 6 as the defendant has claimed, before adjustment for role in the offense, which adds four points. It is Level 20, as the Probation Department originally calculated it.

With regard to Count 36, the August 1989 travel from Rhode Island to Connecticut, I find that travel was in furtherance of extortion, not simply travel regarding structure as the defendant now contends. Thus, that Count should also be rated as a Level 20, rather than a Level 6 as the defendant asserts.

Count 39 pertains to the October 29, 1989 Travel Act violation relating to the Mafia

induction ceremony held on Guild Street in Medford, Massachusetts. The Probation Department has recommended that this violation be rated as a Level 6 because it perceives the travel to be in service of the structure of the racketeering enterprise. The government asserts that the Count 39 travel should be rated as a Level 20 because it was travel in furtherance of extortion. I find that the travel should be rated at a minimum as a Level 12 as travel in service of gambling, or as a Level 20 as travel in service of extortion. However, none of those distinctions matter because even if it is rated as a Level 12, it adds one Offense Level to the defendant's total Offense Level computation, therefore raising him to Level 27.

Basically, the facts in brief summary are that the ceremony held on October 29, 1989, was intended to induct new members of the Patriarca Family in Boston, and that this was intended to enhance the ability of the Family to engage in its criminal business. The evidence demonstrates that the heart of that criminal business of the Patriarca Family was illegal gambling and loansharking, a form of extortion. Indeed, as was foreseeable, loansharking was discussed by several people at the induction ceremony, although not in the defendant's presence. Thus, the Offense Level, as I said, is at least a Level 12. Anything ranging from Level 12 to Level 20 adds one Offense Level to the calculation previously done by the Probation Department. So the defendant's total Offense Level is 27.

With regard to the matter which has consumed the greatest attention since the defendant pled guilty in December, 1991, the government argues that seven acts that the defendant was not charged with, including the murder of Vincent James Limoli and the murder of Ted Berns by Salvatore Michael Caruana, constitute relevant conduct, under § 1B1.3 of the Guidelines, regarding the defendant's counts of conviction for violations of 18 U.S.C. § 1961 *et seq.*, the Racketeer Influenced and Corrupt Organizations Act, ("RICO"). The government has not contended that these acts are relevant conduct with regard to the counts of conviction involving Travel Act violations, Counts 30, 31, 36, 38 and 39.

█ I find that the government's position regarding relevant conduct concerning the RICO charges is incorrect as a matter of law. As I will describe in considerable detail later, the applicable Guidelines are somewhat ambiguous. I find, however, that when they are properly read, they express the intention that when RICO is involved, a defendant's Base Offense Level should be computed on the basis of the underlying racketeering activities with which he was charged in the indictment and any relevant conduct relating to those underlying charges. The Guidelines may then be adjusted upward for a defendant's role in the offense.

Here the Base Offense Level for the RICO charges is the Base Offense Level for the defendant's Travel Act predicate acts and the substantive counts with which he was charged, plus a four-level increase for his role as the Boss of the Patriarca Family. As a matter of law, the other events the government relies on are not relevant conduct for the purposes of computing the defendant's Base Offense Level in this case. So, prior to consideration of departures, the Base Offense Level for the defendant is 27.

With regard to departures, contrary to the government's contention, no upward departure is warranted under § 5K2.0, the general departure provision of the Guidelines. This case does not involve aggravating circumstances which are of a kind, or which exist to a degree, not adequately considered by the Sentencing Commission in promulgating the RICO Guideline.

As the Sentencing Commission knew, RICO was primarily intended to provide a means to prosecute members of the Mafia. The fact that the defendant was the Boss of a Mafia Family was also adequately considered and addressed in the Guidelines, which provide a four level increase for his role in the offense. *See* U.S.S.G. § 4A1.3(a).

In addition, even if membership in the Mafia or a defendant's role as a Mafia Boss were not adequately considered by the Sen-

tencing Commission generally, the proven facts in this case do not establish that an upward departure for Patriarca is warranted. With regard to § 5K2.0, there are no proven facts or circumstances regarding the defendant which are so rare or extreme that an increase in his Offense Level under § 5K2.0 is appropriate.

A one-level increase in the defendant's Criminal History Category, however, is appropriate under § 4A1.3 because the government has proven in one respect that the defendant's Criminal History Category does not adequately reflect the seriousness of his past criminal conduct. I do not find, however, that a departure is warranted under the second prong of § 4A1.3, which addresses whether the defendant's criminal history adequately reflects the likelihood that he will commit crimes in the future.

Under the Guidelines, § 4A1.3 departures based on criminal history are to be structured as if the defendant had been convicted and punished for additional, otherwise uncounted crimes that the government has proven at sentencing. In this case, although it is a close question, I find that the government has proven by a preponderance of the evidence that the defendant aided and abetted drug crimes committed by Salvatore Michael Caruana. For present purposes, I also assume, without finding, that the defendant also helped harbor Caruana when he became a fugitive from the federal drug charges against him. If the defendant had been convicted and sentenced to 13 or more months in prison for these two related crimes, his Criminal History Category would be II.

I also find that the government has not proven by a preponderance of the evidence that the defendant conspired to commit, or aided and abetted the commission of, any other crimes it argues justify an upward departure. As I will later describe in detail, the government has not proved the defendant's complicity in the murder of Vincent James Limoli or Ted Berns, or any other specified crimes. Thus, I find that the defendant's proper Criminal History Category is II.

The defendant's Guidelines, then, are a total Offense Level of 27 and a Criminal History Category of II. Based on those findings and the calculations which the Probation Department and I have done, the range of sentence that I may impose is 78 to 97 months in prison, two to three years of supervised release, a fine of $12,500 to $125,000, plus the costs of confinement and supervision. Depending on where I decide to impose sentence within the 78 to 97 month range, the cost of confinement is between $98,000 and $122,000. The cost of supervision is in the range of $4,000. There is also a mandatory $350 special assessment.

## II. *Factual Context.*

It is important to view this sentencing in the context of the factual history that led to the defendant's indictment and the history of related cases. I have been compelled to do that by the nature of the case and, particularly, by the nature of the arguments made by the government concerning the sentence that ought to be imposed. I think, however, it is also useful to public understanding, and potentially helpful to anybody who may review my decisions, to describe some of the key aspects of the factual history leading to the defendant's indictment and the procedural history of this and related cases.

Essentially, I continue to view many of the material facts as I described them in my June, 1991 bail decision concerning Patriarca. *See United States v. Patriarca,* 776 F.Supp. 593, 600–05 (D.Mass.1991). The defendant is Raymond J. Patriarca, who is also sometimes known as "Junior." The defendant is now 47 years old. He suffers from recurring bladder cancer, which has been controlled so far by periodic examinations and removal of recurrent tumors. Since his incarceration, the defendant's cancer is recurring more frequently. The most recent letter from his doctor, James E. Ellis, indicates that his cancer has recurred since his incarceration in March, 1990, in May, 1990, in December, 1990, in April, 1991, and in February, 1992. *See* Letter from James E. Ellis, M.D., dated May 3, 1991, made part of the Presentence

Report. I understand tumors were removed at those times. *Id.*

The defendant is the only son of Raymond L.S. Patriarca, who was for many years the powerful Boss of the New England organized crime Family which still bears his name. Raymond L.S. Patriarca brought his son into the "family business." Initially, the defendant Raymond J. Patriarca's role in the Family was to assist his father. The evidence indicates that he served as a messenger to other organized crime members and associates of the Patriarca Family on behalf of his father. As I will describe in detail later, with his father, the defendant dealt with Salvatore Michael Caruana, a major marijuana trafficker.

The evidence also indicates that the defendant was ambivalent about his role in La Cosa Nostra (the "LCN"). In 1981, Raymond L.S. Patriarca was very ill. He was not able to deal directly with the LCN members in Boston. The electronic surveillance conducted by the Federal Bureau of Investigations (the "FBI") indicates that some members of the LCN in Boston were attempting to communicate with Raymond L.S. Patriarca through his son. Raymond J. Patriarca, however, requested and received from his father permission to bow out of this role. The tape recorded conversations indicate that he said he could not stand being his father's agent in dealing with the LCN in Boston. More specifically he said about the LCN in Boston: "these guys are really bothering me. I can't keep after them." *See* April 6, 1990 Affidavit of Supervisory Special Agent James A. Ring In Support of Pretrial Detention of Raymond J. Patriarca, Carmen A. Tortora and Pasquale Barone (under seal), ("Ring Aff."), ¶ 10.

The evidence in this case indicates that the defendant's ambivalence about following his father in the Mafia was not unique. Philip Leonetti, the former Underboss of the LCN Family in Philadelphia, testified that the son of the Philadelphia Boss, Nicky Scarfo, committed suicide because of the pressure to follow in his father footsteps. *See* Testimony of Philip Leonetti, ("Leonetti Test."), May 18, 1992.

However, the defendant Raymond J. Patriarca did not reject the potential for power and profit his father's position offered him. As a result, the defendant, for at least the last 15 years, has been extensively investigated by the federal government, which has long sought the conviction of the key members of the Patriarca Family.

The evidence presented to me showed that in the 1980's, the defendant continued criminal activities on behalf of the Patriarca Family and was also legitimately involved in the construction business, personally and substantially participating in the development of the Kendall Estates in Rhode Island. Nevertheless, in 1983, his involvement with Salvatore Michael Caruana was such that other members of the LCN expected that the defendant would be indicted on drug charges with Caruana. *See* Exhibit 20, Transcript of Recorded Conversation, ("Tr."), August 25, 1983, p. 1. Caruana was indicted. *See United States v. Salvatore Michael Caruana, et al.,* D.Mass., Cr. No. 83–309–Z. The defendant was not.

In July, 1984, Raymond L.S. Patriarca died. The FBI's electronic surveillance, among other things, demonstrates that the defendant would not have been selected as Boss if the LCN were run as a democratic organization. *See* Exhibit 14, Tr., August 31, 1983, p. 2–3. Many of the members of the Family would have preferred a leader who had earned his position. In one conversation a preference was expressed for Ilario Zannino of Boston. *See* Exhibit 13, Tr., August 24, 1983, p. 1. In addition, there is evidence that many members of the Family hoped and expected that Nicholas Bianco, who had long ties to the New York LCN Families as well as to the Patriarca Family, would succeed Raymond L.S. Patriarca. *See United States v. Patriarca,* 776 F.Supp. at 601, n. 43.

However, Raymond L.S. Patriarca arranged for his son to succeed him. I find that the defendant became Boss of the Patriarca Family as a result of nepotism rather than merit. This is a view that has been shared by various law enforcement

officials, including former Rhode Island State Police organized crime investigator, Vincent Vespia. Vespia has been publicly quoted as saying: "Junior did not have the brains to lead the family. If his father had not come before him, he wouldn't have gotten the job. He couldn't lead a Brownie troop." *Id.* at 601, n. 46.

By the mid–1980's the government had successfully prosecuted substantially all the known hierarchy of the LCN in Boston, including Gennaro Angiulo and Ilario Zannino, and many others. *See United States v. Angiulo*, 897 F.2d 1169 (1st Cir.), *cert. denied*, 498 U.S. 845, 111 S.Ct. 130, 112 L.Ed.2d 98 (1990); *United States v. Zannino*, 895 F.2d 1 (1st Cir.), *cert. denied*, 494 U.S. 1082, 110 S.Ct. 1814, 108 L.Ed.2d 944 (1990); *United States v. Angiulo*, 847 F.2d 956 (1st Cir.), *cert. denied*, 488 U.S. 852, 109 S.Ct. 138, 102 L.Ed.2d 110 (1988).

The death of Raymond L.S. Patriarca and, particularly, the government's successful investigations dramatically disrupted the operations of the Patriarca Family. There was considerable chaos and competition for power within the Family in Boston. The defendant, however, did little to try to assert power or maintain control of the Patriarca Family, particularly in Boston. Essentially, the defendant was unwilling or unable to labor to retain and truly possess what he had inherited from his father.

There was electronic surveillance in the car the defendant used on February 14, 1986, which was very revealing regarding the defendant's state of mind at that time. *See* Exhibits 11A, 11B, Tr., February 14, 1986. The FBI had planted a bug in the car that the defendant used. I have listened to the tapes as well as read the transcripts concerning those bugs. I am convinced that the defendant did not know that he was being overheard in those discussions. The discussions intercepted by the government in that car reveal a man who was at that time sick and tired. The defendant states in those conversations that because of law enforcement pressure and his cancer, which had recurred, he earnestly wanted to sell his house and leave New England to live peacefully in Florida. *See* Exhibit 11A, *supra*, pp. 1–3.

More specifically, the defendant said to his driver that he wanted to sell his house and move to Florida. He explained passionately how tired he was of being followed and having his name in the newspapers all the time. Indeed, his lawyers wanted him to sue the government for misconduct in investigating him and improperly disclosing information it had obtained. The defendant refused. He said: "I am dropping all lawsuits. I ain't going to sue my country. It's like being a Communist, or something. We've got enough troubles in this country without me causing more for them." *See* Exhibit 11B, *supra*, p. 1. The defendant also expressed the concern that his notorious name might prevent his son from being admitted to West Point. *Id.* He was also very worried about his cancer. He explained how it had recurred. He was bleeding and was facing surgery. He said *he might kill himself before he would let them "cut him."* *See* Exhibit 11A, *supra*, p. 2. With regard to his lawyers, the Mafia and the government, he said: "I don't want to bother with no one, talk to no one or see no one." *Id.* at 3.

However, while the defendant may have been sick and tired, he was also weak. He did not leave New England and he did not leave the Mafia. Nor did he exert control of the Patriarca Family activities in Massachusetts.

The evidence indicates that after Raymond L.S. Patriarca died and the Angiulos and others were convicted in Boston, the Boston members attempted to reorganize, but they did not keep the defendant fully informed of their activities. Nor did they share their often meager profits with the defendant.

With regard to the meagerness of some of the income generated by the efforts of the Patriarca Family members, I find evidence concerning Antonio Spagnolo, who is also known as "Spucky," in a related case before me to be instructive. *See United States v. DiGiacomo*, 746 F.Supp. 1176, 1183–84 (D.Mass.1990). Spagnolo was a soldier in the DiGiacomo regime of the

Patriarca Family. That regime was penetrated as a result of an impressive undercover operation conducted by FBI Special Agent Vincent delaMontaigne.

Spagnolo was tape recorded complaining to delaMontaigne that business was bad because "things were tough in the Mafia." *Id.* at 1184. Indeed, Spagnolo was unable to raise $35,000 for a marijuana deal. In addition, he and delaMontaigne, as part of this undercover operation, ran an illegal poker game. When Spagnolo's share of the profits after several months amounted to only $30, he stuffed the money in his mouth and threatened to return to making money the "old way," as he called it, by "pulling kids out of sneakers and stealing their money." *Id.*

The evidence also indicates that the Patriarca Family members in Boston did not share the proceeds of their more successful crimes with the defendant. I have considered considerable evidence relating to the extortion at Vanessa's Food Shop of the bookmakers Sagansky and Weinstein by Vincent Ferrara, Dennis Lepore, Angelo Mercurio, and others. The evidence includes electronic surveillance of the extortion and of the division of the $250,000 proceeds of that crime. That electronic surveillance recorded shares being discussed for Joseph Russo and Robert Carrozza, who were not present. *See* Exhibit 12, Tr., January 15, 1987, pp. 1–22; *see also Patriarca*, 776 F.Supp. at 602. There is no discussion of money going immediately or eventually to the defendant. Rather, the participants discussed keeping this extortion secret. Considering that evidence in the context of all the other evidence concerning the Vanessa's extortion, I find that the government has not proven by a preponderance of the evidence that any of the members of the Patriarca Family intended to give the defendant any money from the Vanessa's extortion, either immediately or eventually.

As the government's Trial Brief accurately describes: "in the spring and summer of 1989, the Family was deeply divided between members, including Russo, Ferrara and Carrozza in Boston, who sought removal of Patriarca as Boss, and members who remained loyal to Patriarca." Trial Brief of United States, filed October 16, 1991, p. 216; *see also* Presentence Report, ¶¶ 57–61, pp. 24–25. As part of an effort to try to persuade Patriarca to abdicate his power and position, the Boston faction caused the Underboss, Billy Grasso, to be shot and killed in Connecticut. On the same day, as part of the same effort, they caused Patriarca ally Frank Salemme to be shot in Massachusetts. Salemme survived. *See Trial Brief of the United States*, pp. 216–17.

The government knew that the defendant was threatened, and took that threat seriously. The FBI warned the defendant that his life was in danger. *See Patriarca*, 776 F.Supp. at 602. That warning was warranted. The defendant was in danger. Joseph Russo threatened personally to kill the defendant if he did not abdicate his position and cede his power to Russo. With tears in his eyes, the defendant begged for his safety and for the safety of his relatives. *Id.*

Nevertheless, the defendant could not quite let go of his position in the LCN. He did, however, delegate substantial power concerning the operation of the Family in Massachusetts to Joseph Russo, and agreed to the induction of new members of the Patriarca Family proposed by the Boston faction. This resulted in the October 29, 1989 Mafia induction ceremony, which was electronically surveilled by the FBI and is described in detail in my decision ruling that the tape recording and related evidence would be admissible at the defendant's trial. *See United States v. Ferrara*, 771 F.Supp. 1266 (D.Mass.1991).

In November, 1989, Joseph Russo, Vincent Ferrara, and Robert Carrozza were indicted for their part in the RICO enterprise known as the Patriarca Family. The case was assigned to United States District Judge A. David Mazzone. In March 1990, a superseding indictment in that case was returned. It revealed the electronic surveillance of the induction ceremony and added a number of defendants, including Raymond J. Patriarca, who was charged

with RICO conspiracy, a substantive RICO violation, a Travel Act conspiracy, and discrete Travel Act violations. Thus, at that time the defendant was joined by the government as a defendant with Joseph Russo, who had threatened to kill him, and Russo's allies in Boston.

At the same time, related indictments were returned against Biagio DiGiacomo and members of his regime of the Patriarca Family, Antonio Spagnolo and Vincent Giocchini. *See United States v. DiGiacomo*, 746 F.Supp. 1176 (D.Mass.1990). DiGiacomo was a Capo in the Patriarca Family. He personally conducted the Mafia induction ceremony on October 29, 1989. The charges in the *DiGiacomo* case involved alleged RICO violations and related charges concerning drug trafficking, loan-sharking, gambling and obstruction of justice. *Id.* That case was assigned to me.

Also at the same time, Nicholas Bianco and other members of the Patriarca Family were indicted in Connecticut on RICO and other charges, along with certain associates of the Patriarca Family. *See United States v. Nicholas L. Bianco, et al.*, Cr. No. H–90–18 (D.Conn.1991). Some of the defendants in that case were indicted on charges relating to the murder of Billy Grasso. Some of the defendants in the *Bianco* case were also charged with the murder of Ted Berns. Raymond J. Patriarca was not charged with anything, including either murder, in the Connecticut case.

### III. *Procedural History.*

With regard to the relevant procedural history of these related cases, in the *DiGiacomo* case the three defendants were released on bail subject to electronic monitoring and other stringent conditions. *See DiGiacomo*, 746 F.Supp. at 1189–99. Subsequently, the defendants and the government entered into binding plea agreements. *See* Fed.R.Crim.P. 11(e)(1)(C).

The government agreed that the defendants could plead guilty to being part of a RICO enterprise which committed the acts alleged in the indictment, while expressly refusing to admit the existence of the LCN, the Patriarca Family, or their membership in both organizations. The defendants and the government agreed to what they and the government represented to the Court were sentences within the Guidelines.

The Guidelines were calculated differently for each of the three defendants. The Guidelines, as calculated by the government, the defendants, and the Probation Department, were based solely on the conduct of each defendant as charged in the indictment. There were no claims that uncharged acts constituted relevant conduct of any of the defendants. For example, Spagnolo was a key person in the dispute which led to the Limoli homicide, which the government in this case contends occurred as part of the Patriarca Family RICO conspiracy and was a reasonably foreseeable consequence of it. *Id.* at 1187. The government did not then, however, assert that the Limoli homicide constituted relevant conduct attributable to Spagnolo. Neither the binding plea agreement, nor the sentence imposed on Spagnolo pursuant to it, included punishment for the Limoli homicide.

I accepted and imposed the agreed-upon sentences for DiGiacomo, Spagnolo, and Giocchini. As the government had agreed and recommended, I also authorized the defendants to self-report to prison. The three of them are now serving their sentences.

With regard to the *Bianco* case, many of the defendants were released pending trial, including Bianco. At that time, Bianco had become the Boss of the Patriarca Family. Raymond J. Patriarca had been demoted from Boss to Soldier, evidently in part because of the LCN's displeasure with his inept leadership which resulted in the interception of the LCN's secret, sacred induction ceremony. *See Patriarca*, 776 F.Supp. at 603.

The *Bianco* case proceeded in the United States District Court in Connecticut. Some of the defendants pled guilty. Some, including John Castagna and Jack Johns, cooperated and testified for the government. The remaining defendants were convicted.

At his sentencing, Bianco was subjected to an upward departure and sentenced to serve eleven years and five months in prison. *See United States v. Nicholas L. Bianco*, Cr. No. H–90–18, (D.Conn.1991), Tr., November 25, 1991. United States District Judge Alan H. Nevas explained at sentencing that this upward departure was warranted in part because Bianco's uncounted criminal history under the Guidelines included his 1963 conviction for violent conduct in the so-called "Profaci" LCN wars in New York. *Id.* at 15. It was also based in part on the fact that Bianco had no legitimate employment history. *Id.* at 30. In addition, the upward departure was based in part on the fact that Bianco had recently succeeded Raymond J. Patriarca as Boss of the Patriarca Family, and thus evidently rededicated himself to the criminal enterprise. *Id.* at 7–8; 29.

With regard to this case, following his indictment, the defendant promptly expressed an interest in pleading guilty. At the defendant's request, Judge Mazzone asked the Probation Department to calculate preliminarily the Guidelines for the defendant. *See* Fed.R.Crim.P. 32(c)(1). Relying on the charges against the defendant in the Superseding Indictment, the Probation Department informed the parties and the Court of its preliminarily view that the Guidelines were Offense Level 26 and Criminal History Category I, which in pertinent part provided for a term of incarceration of between 63 and 78 months.

Evidently, the government was not willing to agree to a sentence in this range and the defendant would not agree to a higher sentence. In November 1990, Judge Mazzone accepted a second full-time job as a member of the United States Sentencing Commission. He kept almost all of his pending cases and has continued to take new cases, rendering a great service to the District of Massachusetts. However, this particular case, which required intensive, continuous pre-trial attention and promised to involve a long trial, was randomly assigned to me.

When I received the case in November 1990, I was informed that the defendant was interested in pleading guilty. I was also informed by the government that if that occurred, the government would seek an upward departure under § 5K2.0 of the Sentencing Guidelines. The government at that time did not claim that the defendant's Base Offense Level should be increased because of uncharged relevant conduct. *See* Tr., November 19, 1991, p. 8.

The defendant indicated to the Court an inclination to plead guilty without a plea agreement as long as he was not required to say anything acknowledging the existence of the LCN or the Patriarca Family, or his role in those organizations. As indicated earlier, the government had agreed in the *DiGiacomo* case that this was legally permissible and appropriate. The government, however, with regard to this defendant questioned the propriety of the Court taking a plea on that basis. I researched the issue and received memoranda from the parties. *See e.g.* Letter from Attorney Martin G. Weinberg re: Fed. R.Crim.P. 11, dated January 11, 1991; Memorandum of the United States Concerning the Effect on Sentencing of the Defendant's Refusal to Admit to Sufficient Facts to Support a Plea of Guilty, filed on January 18, 1991; Government's Memorandum of Law Concerning Rule 11(f) of the Federal Rules of Criminal Procedure, filed on January 9, 1991.

In addition, I conferred with counsel on the record in January and February of 1991, primarily to discuss whether it was permissible for the defendant to be silent with regard to the factual basis for his plea which the Court would have to find under Federal Rule of Criminal Procedure 11(f). I was satisfied that I could rely only on the government's statement and other evidence, and that the defendant would not have to confirm the factual basis for his plea of guilty. *See, e.g., North Carolina v. Alford*, 400 U.S. 25, 37–39, 91 S.Ct. 160, 167–68, 27 L.Ed.2d 162 (1970); *McCarthy v. United States*, 394 U.S. 459, 467, 89 S.Ct. 1166, 1171, 22 L.Ed.2d 418 (1969); *Irizarry v. United States*, 508 F.2d 960, 967 (2nd Cir.1974); *United States v. Webb*, 433 F.2d 400, 403 (1st Cir.1970), *cert. denied*, 401 U.S. 958, 91 S.Ct. 986, 28 L.Ed.2d

242 (1971); *United States v. Alvarez–Quiroga,* 901 F.2d 1433, 1438 (7th Cir.), *cert. denied,* 498 U.S. 875, 111 S.Ct. 203, 112 L.Ed.2d 164 (1990). I so informed the parties.

The government asserted that it would seek an upward departure under § 5K2.0 and § 4A1.3 if the defendant pled guilty. Once again, the government did not then mention its present claim that uncharged acts constitute relevant conduct raising the Base Offense Level of the defendant thereby obviating the need for any departure. *See* Tr., January 7, 1991, p. 39.

It is appropriate and perhaps important to note that the foregoing discussions occurred in the context of the Court attempting to predict the parameters of a possible sentencing hearing, an issue relevant to the exercise of the Court's discretion whether to accept the plea without the defendant confirming the factual basis for it. The discussions did not occur in the context of the Court participating in negotiations concerning a possible plea agreement. *Id.; see also* Fed.R.Crim.P. 11(e)(1). The parties' discussions concerning a possible plea agreement had terminated.

The defendant did not promptly plead guilty. The Court was informed that he wished to seek release on bail. The standard for the defendant obtaining his release is much higher after a guilty plea than it is when he is still presumptively innocent. Prior to a guilty plea, the government must prove that no combination of conditions will reasonably assure the defendant's appearance or the safety of the community. *See* 18 U.S.C. § 3142(f); *compare* 18 U.S.C. §§ 3143(a) and 3145(c).

After a series of hearings, on June 19, 1991, the Court found that there were a combination of conditions on which it would be appropriate to release the defendant. *See Patriarca,* 776 F.Supp. at 595–97. Included among those conditions was electronic monitoring similar to that utilized in the *DiGiacomo* case. *See DiGiacomo,* 746 F.Supp. at 1189–90.

In addition, one condition of release required that Patriarca's relatives pledge about four million dollars in property, which would be subject to forfeiture if he violated any condition of his release. The order included not only the usual forfeiture provisions for failure of the defendant to appear as required in court, but also included the possibility of forfeiture if the defendant committed any crime or communicated with anyone without authorization of the Court, a condition which would have precluded communication with members of the LCN. *See Patriarca,* 776 F.Supp. at 607.

However, I stayed the decision to release the defendant pending a possible appeal. The government did appeal.

On October 28, 1991, the Court of Appeals affirmed most of my findings, but remanded the matter for determination of what percentage of the defendant's assets the four million dollars represented. *See United States v. Patriarca,* 948 F.2d 789, 794–95 (1st Cir.1991). This is an issue that I had not pursued because I was relying on the defendant's desire not to cause many of his relatives to lose their money, homes and other property, rather than on the percentage of the defendant's personal assets that four million dollars represented. *See Patriarca,* 776 F.Supp. at 605, 616; *see also United States v. O'Brien,* 895 F.2d 810, 816 (1st Cir.1990). My order with regard to the four million dollars was intended to be a provision for forfeiture by sureties under 18 U.S.C. § 3142(c)(1)(B)(xii), not a provision for forfeiture by the defendant under 18 U.S.C. § 3142(c)(1)(B)(xi). *Patriarca,* 776 F.Supp. at 605. It is evident, however, that I did not make this sufficiently clear.

The Court offered the defendant an opportunity to produce the financial information contemplated by the remand and the opportunity to litigate issues which might be raised by the government relating to his net worth and his release. The defendant was not willing to produce the information necessary for the net worth analysis contemplated by the Court of Appeals. Rather, the defendant asked me to continue to rely on the sentimental value of his relatives' homes and to authorize his release.

As these matters were being discussed in November, 1991, the defendant's trial was

scheduled for early January, 1992. In November, 1991, the defendant informed the government and the Court that he would plead guilty without an agreement with the government and later ask the Court to decide the detention issues, recognizing that it would then be more difficult for him to obtain his release by virtue of the change of plea. *See* 18 U.S.C. §§ 3143(a) and 3145(c) (defendant who pleads guilty must be detained unless court finds by clear and convincing evidence that defendant does not pose risk of flight or danger to the community and that exceptional circumstances exist justifying release).

The change of plea was scheduled for December 3, 1991. On December 2, 1991, I met with counsel to discuss matters relating to that plea. Defendant's counsel indicated that the defendant would be silent with regard to the factual basis for a plea. I again indicated that this was legally permissible. *See* Tr., December 2, 1991, p. 4.

In addition, I discussed with the parties factual disputes that might have to be addressed at sentencing. I remained interested in ascertaining the parameters of any sentencing hearing. *Id.* at 17. Speaking colloquially, I also said that I did not want either party or the Court to be "sandbagged" when we got to the sentencing. *Id.* at 20.

Counsel for the government and defendant indicated that there would be a dispute concerning whether the Travel Act violations in Counts 31 and 36 were in furtherance of extortion or some other criminal purpose with a lower Guidelines rating. *Id.* at 24–25; 32. The Court agreed that it was appropriate to accept the plea without resolving these issues because the disputed facts were not relevant to guilt, but only to the calculation of the Guidelines range. *Id.* at 22–23.

The government stated it would seek an upward departure for matters like the Limoli homicide charged in the indictment for which there was no specific evidence linking the defendant directly to the crime. *Id.* at 17. The government also told the Court that it would rely on the fact that the

defendant was the head of an LCN Family to justify an upward departure. *Id.* at 13.

In addition, the government said it would seek to have the defendant's Base Offense Level increased on the basis of relevant conduct for matters like Caruana's drug distribution for which the government felt it had proof of the defendant's direct involvement. *Id.* at 12–13.

With this background, we proceeded to the defendant's change of plea on December 3, 1991. The defendant changed his plea to guilty on all counts of the Superseding Indictment against him. The defendant was advised of his right to dispute how the Travel Act violations in Counts 31 and 36 should be rated. *See* Tr., December 3, 1991, pp. 15, 45. The government did not at that time claim that Count 39, concerning the induction ceremony, should be given more than a Level 6 rating; it now says that it should be a Level 20.

The defendant in his change of plea confirmed that he understood that it was not then possible to know with certainty how the Guidelines would be calculated by the Court at sentencing. *Id.* at 23. The defendant understood that he could not withdraw his plea if the Guidelines calculations or his sentence were higher than he had hoped. *Id.* 24–5.

As indicated earlier, the defendant was expected to be silent concerning the factual basis for his plea. After pleading guilty to the RICO charges, however, he gratuitously added: "I am not admitting my membership in the Mafia." *Id.* at 35.

The government then objected to the Court accepting the plea. *Id.* at 36. I, however, asked the defendant the questions required to take an *Alford* plea in the event that it were perceived by someone, although it was not perceived by me, that the defendant was tendering an *Alford* plea. *See Alford, supra.* After receiving his responses, as in the *DiGiacomo* case, I decided that the defendant's refusal to admit membership in the Mafia did not render his plea unacceptable. *See* Tr., December 3, 1991, pp. 80–85. He was willing to admit to being part of an enterprise substantially similar to the one alleged in the indictment,

among other things. *Id.* Thus, I accepted the defendant's plea. However, as with his co-defendants, the defendant has not received a two level reduction for acceptance of responsibility in the Guidelines calculations, notwithstanding his plea of guilty, in part because of his express refusal to admit his membership in the Mafia. *See* U.S.S.G. § 3E1.1.

On December 13, 1991, I had a hearing to review again the defendant's detention. I denied his release. As I explained at that time, I found that the defendant had pled guilty to a crime of violence—a Travel Act violation in aid of extortion. *See* 18 U.S.C. § 3156(a)(4). Under the circumstances, the defendant had the burden of proof. He had to prove by clear and convincing evidence he would not flee, or pose a danger to the community, and that there were exceptional circumstances warranting his release. *See* 18 U.S.C. §§ 3143(a); 3145(c). The defendant did not satisfy this burden. Thus, his detention was continued.

On January 6, 1992, jury selection in this case began with regard to five of Patriarca's co-defendants. After nine days of jury selection, arduous plea negotiations resulted in five binding plea agreements pursuant to Fed.R.Crim.P. 11(e)(1)(C). *See United States v. Robert Carrozza, et al.,* Memorandum & Order, ("Carrozza Order"), May 7, 1992, pp. 2–4, 1992 WL 137112. All defendants except Joseph Russo agreed to be silent with regard to the factual basis for their pleas. *Id.* at 3, n. 2. Russo agreed with the government to serve an extra year in prison in return for the government not objecting to his making very limited remarks indicating that by pleading guilty he was not acknowledging the existence of the LCN or his membership in it. *Id.*

The plea agreements included Guidelines calculations done by the government and the defendant based solely on the charges in the Superseding Indictment against each defendant. There was no claim that the Guidelines for any defendant should be increased for any alleged relevant conduct. For example, although Carrozza was directly involved with Spagnolo in the dispute that led to the Limoli murder, the government did not claim that the Limoli murder constituted relevant conduct for the purpose of calculating Carrozza's Guidelines.

The government also did not assert that any upward departures were appropriate. Instead, the government agreed to downward departures from life sentences for Vincent Ferrara and Joseph Russo. *Id.* at 6–7. After briefing and hearing, I found the plea agreements to be reasonable and imposed the sentences that the parties had agreed upon. *Id.* at 13–22.

With regard to Patriarca's sentencing, after the defendant pled guilty, the government asserted that there were seven crimes, including the Limoli murder, which constituted relevant conduct attributable to the defendant and substantially increasing his Offense Level, thus eliminating the need for any departure. The scope of the relevant conduct included in the Base Offense Level in a RICO case is an unprecedented issue, at least in the reported cases. It is also an issue with significant consequences for the defendant in this case. The issue has the potential to raise the sentence in this case from the seven year range that the Probation Department originally calculated, to a life sentence, as I see it, or a 30 year sentence as the government calculates it.

The defendant responded that the government's position regarding relevant conduct is incorrect as a matter of law. The defendant also asserted that the government could not prove as a matter of fact the defendant's complicity in the crimes on which it was relying. The defendant further argued that the government's position, if persuasive, would violate the defendant's rights to due process and to not being subject to any *ex post facto* law. *See* U.S. Const. Art. I, § 9; Am. XIV; Defendant's Second Supplemental Sentencing Memorandum, filed March 24, 1992, pp. 11–14; 16–17. The defendant also had a number of other objections.

I received a series of increasingly refined memoranda from the parties. I also received numerous affidavits and voluminous documentary evidence. I held conferences

on March 3 and 26, April 8 and 9, and May 5, 11 and 12, 1992.

As stated in my May 11, 1992 order, I found it was appropriate to hear testimony from Philip Leonetti and Special Agent of the FBI, James Maher, as experts whose testimony might be helpful on the question whether the Patriarca Family had routine practices which would tend to prove that the defendant should be punished for the Limoli murder, as relevant conduct or as a basis for an upward departure. *See* Fed. R.Evid. 406. In addition, such evidence of possible practice was also relevant to the defendant's involvement in at least some of the other crimes alleged by the government, including the murder of Ted Berns.

The Court did not find that the evidence presented necessitated testimony regarding the disputes relating to the Travel Act violations. I indicated that after hearing Leonetti and Maher, I would decide whether taking additional evidence was warranted.

I heard the testimony of Leonetti and Maher on May 18, 19 and 20, 1992. At the outset of that testimony, I told the parties of my doubts concerning the government's position on relevant conduct. I told the parties, however, that I would consider the evidence I was about to hear on the issue of departures as well as the question of relevant conduct. On May 26 and 27, 1991, I heard argument from the parties regarding the Travel Act disputes, relevant conduct and departures. I then took this matter under advisement.

Since taking the matter under advisement, I have studied the voluminous documentary evidence. For reasons I will describe in more detail later, I find that no additional testimony is warranted.

The defendant did not offer any evidence to refute the information the government submitted regarding his relationship with Salvatore Michael Caruana, although given an opportunity to do so in my Orders of March 4 and April 10, 1991.

As I will describe in detail later, the government has not offered sufficient evidence to justify taking additional testimony or evidence on the other alleged crimes it relies on for departure. *See, e.g.,* U.S.S.G.

§ 6A1.3(a) ("[w]hen any factor important to the sentencing determination is reasonably in dispute, the parties shall be given an opportunity to present information to the court regarding that factor"); Fed. R.Crim.P. 32(c)(3)(A) ("The court shall afford the defendant and the defendant's counsel an opportunity to comment on the [presentence] report and, *in the discretion of the court,* to introduce testimony or other information relating to any alleged factual inaccuracy contained in it") (emphasis added); *see also United States v. Zuleta–Alvarez,* 922 F.2d 33, 35–36 (1st Cir. 1990), *cert. denied,* — U.S. —, 111 S.Ct. 2039, 114 L.Ed.2d 123 (1991). Thus, I have all the evidence, briefing and arguments necessary and appropriate to decide the disputed sentencing issues. I have done so.

## IV. *The Travel Act Violations.*

To put the Travel Act violations in context again, the defendant has pled guilty to all the charges against him. These charges include: Count 1 involving a RICO conspiracy; Count 2, the substantive RICO charge; Count 30, the Travel Act conspiracy; Count 31, the Travel Act violation occurring in August, 1985 involving Robert Carrozza; Count 36, the Travel Act violation occurring in August, 1989 involving Matthew Gugliemetti's travel to Connecticut; Count 38, the Travel Act violation relating to travel preceding the October, 1989 induction ceremony involving this defendant and Joseph Russo; and Count 39, the Travel Act violation in connection with the induction ceremony on October 29, 1989.

All of the predicate acts and substantive offenses the defendant is personally charged with in the Superseding Indictment involve the Travel Act, 18 U.S.C. § 1952. These are summarized in the defendant's pattern of racketeering activity. *See* Superseding Indictment, pp. 42–43.

With regard to Count 1, the RICO conspiracy, Racketeering Act F–1 does not involve a separate substantive count. *See* Superseding Indictment, p. 22. It has,

however, been included in the Guidelines calculation as if it constituted a count of conviction. *See* U.S.S.G. §§ 3D1.2 and 3D1.3.

Racketeering Act F–1 is not mentioned in Count 30, the Travel Act conspiracy. Racketeering Act F–1 alleges travel between Massachusetts and Rhode Island in February 1981, when the defendant served as a messenger for his father. More specifically, it involves travel which was electronically surveilled by the FBI and in which the defendant expressed his desire not to serve as the messenger for his father and not to have to bother with members of the LCN in Boston. *See* Ring Aff. ¶ 10; *see also* Trial Brief of United States, pp. 102–03.

The Presentence Report rates the travel for Predicate Act F–1 as a Level 6, involving travel concerning structure. *See* Section 2E1.2(a)(1). At that time, the defendant was not the Boss of the Patriarca Family, so there is no adjustment for role in the offense. Neither the government nor the defendant has objected to this rating.

Racketeering Act F–3 corresponds to Count 31. Count 31 involves the August 1985 travel by Robert Carrozza, concerning Carrozza's desire to replace the deceased Tameleo as the person Frank Mantia would have to pay in connection with his loansharking debts. *See* Superseding Indictment, pp. 23; 109.

The Presentence Report recommended that the Court find the travel occurred in furtherance of extortionate credit transactions and thus be rated as a Level 20. *See* U.S.S.G. § 2E2.1, "Making or Financing an Extortionate Extension of Credit; Collecting an Extension of Credit by Extortionate Means." I note that this is a rating given in the Presentence Report regarding Robert Carrozza himself. The government did not object to this with regard to Carrozza. The government now, however, asserts that the rating should reflect that the travel was in aid of drug distribution because Carrozza intended to use the money to buy cocaine, and this, therefore, constitutes rel-

evant conduct for Patriarca. *See* U.S.S.G. § 1B1.3.

The government contends that the adjusted Offense Level for Count 31 should be 34; 30 being a narcotics rating based on the amount of drugs allegedly involved and 4 being the upward adjustment for the defendant's role in the offense. *See* U.S.S.G. §§ 2D1.1(c)(7); 3B1.1(a). The defendant claims it should be a Level 6 because there is no proof that loansharking was involved. *See* U.S.S.G. § 2E1.2(a), "Interstate of Foreign Travel in Aid of a Racketeering Enterprise." For reasons I will explain, the Probation Department is correct. The proper rating is Level 20 because the travel was in aid of extortion, not narcotics, and the government has failed to prove by a preponderance of the evidence that the narcotics dealing of Carrozza constituted relevant conduct attributable to Raymond J. Patriarca.

As I will explain later, the fact that the government's position may have been different with regard to Carrozza, or any other defendant, on any of these matters, is not material to the analysis that I have done. I am not relying on that in any way.

Probation has added 4 levels under § 3B1.1(a) because of the defendant's role in the offense as Boss of the Family. Defendant does not object to this. So, Racketeering Act F–3 and Count 31 are rated as a Level 24.

Racketeering Act F–8, which corresponds to Count 36, involves Gugliemetti's travel from Rhode Island to Connecticut on or about August 10, 1989. *See* Superseding Indictment, pp. 26; 114. The Probation Department rates that travel as in furtherance of extortion, specifically loansharking, and as a Base Offense Level 20, with a four Level increase for the defendant's role as Boss. The defendant objects, asserting that this travel related only to structure, so it should be rated as Level 6 and adjusted upward to 10 based on his willingness not to dispute, for present purposes, his status as Boss of the Family. I find that the Probation Department is correct, and this violation should be rated as a Level 24.

Racketeering Act F–10 and Count 38 relate to the pre-October 29, 1989, travel involving the defendant Joseph Russo. *See* Superseding Indictment, pp. 28; 116. The Probation Department recommended that this be rated as Level 6 as travel relating to structure and adjusted upward four levels for the defendant's role as Boss. Neither the government nor the defendant has objected to that rating.

Racketeering Act F–11 corresponds to Count 39, concerning the travel relating to the October 29, 1989 induction ceremony. *See* Superseding Indictment, pp. 28; 117. The Probation Department recommended that the travel be rated in the same way as Count 38, as travel relating to structure, with a Base Offense Level of 6, adjusted upward to 10 for the defendant's role in the offense. The government objected, asserting it was travel in the aid of extortion, which would be a Base Offense Level 20 and adjusted upward four levels.

As I indicated earlier, I agree that Count 39 should be at least rated as Base Offense Level 12, *see* U.S.S.G. § 2E3.1, "Engaging in a Gambling Business," and probably as Level 20, *see* U.S.S.G. § 2E2.1, "Making or Financing an Extortionate Extension of Credit; Collecting an Extension of Credit by Extortionate Means," with an upward adjustment of 4 for the defendant's role as Boss. *See* U.S.S.G. § 3B1.1(a). Either way, the effect on the Guidelines is the same. *See* U.S.S.G. §§ 3D1.1, 3D1.3, 3D1.4. Under the multiple count analysis, the defendant's Base Offense Level is raised from 26 to 27.

The government did not object to the Presentence Report recommendation regarding Count 30, the Travel Act conspiracy. *See* Superseding Indictment, pp. 103–08. The only allegations in Count 30 regarding this defendant are overt act 3, the February of 1981 travel to Rhode Island to discuss structure with the defendant; overt act 10, the August 1989 Gugliemetti travel to Connecticut; and over act 12, relating to the travel to the induction ceremony. *Id.* at 105; 107.

With regard to the standards for determining the Base Offense Level, the Guidelines in § 1B1.2 Subsection (a) direct the court to "[d]etermine the offense guidelines section most applicable to the offense of conviction." U.S.S.G. § 1B1.2(a). Subsection (d) of Section 1B1.2 indicates that on a count of conviction charging a conspiracy to commit more than one offense, the court should treat the matter as if the defendant had been convicted on a separate count for each offense he conspired to commit. U.S.S.G. § 1B1.2(d).

As the parties recognize, with regard to the Travel Act counts, § 2E1.2, which expressly applies to violations of 18 U.S.C. § 1952, the Travel Act, is the applicable Guidelines section. Section 2E1.2 establishes a Base Offense Level of the greater of Level 6, or "the offense level applicable to the crime of violence or other unlawful activity in respect to which the travel was undertaken." U.S.S.G. § 2E1.2(a)(2).

Disputed Counts 31, 36 and 39 and the corresponding Racketeering Acts, do not allege travel to commit any crime of violence. All three allege travel to carry on an "unlawful activity." In this context, the term "unlawful activity" has a specific meaning provided expressly in 18 U.S.C. § 1952. "Unlawful activity," as defined in 18 U.S.C. § 1952(b), means: (1) any business enterprise involving gambling or narcotics; and (2) extortion. Travel to carry on a RICO enterprise in violation of 18 U.S.C. § 1961, *et seq.*, is not defined as "unlawful activity" for the purpose of 18 U.S.C. § 1952 and U.S.S.G. § 2E1.1. However, travel to promote a business enterprise involving gambling or a narcotics business is included.

With regard to the disputed Counts 31, 36 and 39, the Superseding Indictment charges alternative forms of unlawful activity that the interstate travel was intended to promote. *See, e.g.,* Superseding Indictment, Count 31, p. 109 ("... Raymond J. Patriarca ... did unlawfully, willfully and knowingly travel or cause travel to occur ... with intent to ... promote ... (1) a business enterprise involving gambling ..., and narcotics ..., and (2) extortion ...")

If the case had gone to trial, the government would have had to prove that the defendant travelled or caused the travel in question, intending to promote only one form of the alleged unlawful activity. *See* 18 U.S.C. § 1952(a); *United States v. Arruda*, 715 F.2d 671, 681 (1st Cir.1983); *United States v. Coran*, 589 F.2d 70, 72 (1st Cir.1978). Thus, as I indicated earlier, the Court accepted the defendant's plea of guilty to Counts 31, 36 and 39 without deciding which of the alleged unlawful activities he intended to promote because those disputed facts did not pertain to guilt. They only pertained to how the Guidelines should be calculated at sentencing.

At the time of the plea, the Court recognized that with regard to Counts 31 and 36, there would be a dispute at sentencing. It was understood, however, that the dispute regarding these counts would involve whether the Guidelines required a rating for each using a Base Offense Level 20 or something lower. Since the change of plea, the government has claimed that Count 31 should be rated as if it involved travel to promote a business enterprise involving narcotics and has also put in dispute Count 39, claiming that the travel to the induction ceremony should be rated as in aid of extortion.

These issues exist because under § 2E1.2, the court must use the Offense Level applicable to the unlawful activity in respect to which that travel was undertaken. The Base Offense Level is 30 for narcotics when, as here, the government alleges 4 to 5 kilograms were involved. *See* U.S.S.G. § 2D1.1(c)(7). The Base Offense Level is 20 for extortion, *see* U.S.S.G. § 2E2.1, and 12 for gambling, *see* U.S.S.G. § 2E3.1. Or, if none of these pertain, it is Level 6. *See* U.S.S.G. § 2E1.2(a).

■ To prove a violation of the Travel Act, the government must prove that the defendant traveled, or caused another to travel, and in doing so intended to promote a particular unlawful activity. *See Arruda*, 715 F.2d at 681; *Coran*, 589 F.2d at 72; Sand & Siefert, *Modern Federal Jury Instructions*, ¶ 60.01, p. 60–2 (1992). More specifically, the government must prove that the defendant "specifically intended" to facilitate a particular activity and that he knew that it was unlawful. *See Coran*, 589 F.2d at 72; Sand & Siefert, *Modern Federal Jury Instructions*, at 60–7; *see also United States v. Lema*, 909 F.2d 561, 569 (1st Cir.1990) (defining aiding and abetting, 18 U.S.C. § 2).

With regard to sentencing, the defendant should be sentenced under the Guidelines which apply to the form of unlawful activity he intended to promote. He is also punishable for relevant conduct, under § 1B1.3, relating to that unlawful activity. I find that if the travel was intended to promote several forms of unlawful activity, the highest Guidelines should be used. This is consistent with the policy expressed by the language of § 2E1.2, which instructs the court to use the greater of the alternative Offense Levels.

Applying these principles to Count 31, the August, 1985 travel relating to Carrozza and the money being extorted from Frank Mantia, which involved a dispute as to whether Carrozza or Peter Fiumara would get the proceeds of the Mantia extortion, I find by a preponderance of the evidence that the travel was in furtherance of extortion and that the defendant knew of that extortion. *See* U.S.S.G. § 6A1.3 (comment) ("[t]he [Sentencing] Commission believes that use of a preponderance of the evidence standard is appropriate to meet the due process requirements and policy concerns in resolving disputes regarding application of the guidelines to the facts of a case"); *United States v. Wright*, 873 F.2d 437, 441 (1st Cir.1989) (adopting preponderance of the evidence standard); *but see United States v. Kikumura*, 918 F.2d 1084, 1099–1101 (3rd Cir.1990) (applying standard of clear and convincing evidence).

I also find that Carrozza used the money extorted from Mantia to purchase drugs from Joseph Covello, also known as "Deemis," a member of the Gambino LCN Family in New York. Raymond J. Patriarca, however, did not know about Carrozza's intended drug transaction. It was not within the scope of his Travel Act conspira-

cy with Carrozza. It was also not a reasonably foreseeable consequence of his conspiracy with Carrozza concerning the August 1985 travel. Accordingly, it is not relevant conduct concerning Count 31 for which the defendant can now be punished. *See* U.S.S.G. § 1B1.3, Application Note 1.

More specifically, the facts show a dispute between Carrozza and Fiumara regarding the right to money owed by Mantia, a victim of loansharking, a form of extortion. *See* Presentence Report, ¶¶ 22–31, pp. 13–16. After Capo Henry Tameleo died, Fiumara and Carrozza each wanted to get to the defendant to obtain authorization to control the allocation of money Mantia would be required to pay in the future.

Carrozza succeeded in meeting with the defendant. He subsequently told cooperating witness John DeMarco and Fiumara that the defendant had given him responsibility for both Mantia and Fiumara. This is reflected in the electronic surveillance. *See* Government's Factual Submission Concerning Relevant Conduct, filed April 23, 1992, pp. 17–19, Tr., August 20, 1985, pp. 1; 2–3; 6; Tr., August 21, 1985, pp. 3–4; Tr., August 25, 1985, pp. 1–4; Tr., August 26, 1985, pp. 1–3; *see also* Presentence Report, ¶ 28–30, pp. 14–16. There is no evidence to the contrary that I have found. Thus, the Court infers that Carrozza explained the dispute concerning loansharking to the defendant and the defendant authorized him to handle the allocation of the Mantia payments.

The evidence also persuades me, however, that narcotics were not discussed in connection with this travel and that Patriarca did not agree to conspire with Carrozza regarding drugs. Nor did he reasonably foresee that drugs would be implicated in the Carrozza travel. The electronic surveillance of John DeMarco indicates that Carrozza intended to discuss extortion with the defendant. *Id.* The electronic surveillance shows no reference to Carrozza discussing a desire to traffic in narcotics with Patriarca.

DeMarco is now in prison and cooperating with the government. I have received an affidavit from him. In that affidavit he did not claim that Carrozza ever said that he told the defendant he wanted the money from Mantia for drug dealing. *See* Affidavit of John A. DeMarco, ("DeMarco Aff."), filed on May 15, 1992.

In the *DiGiacomo* case, FBI Special Agent Joseph Hannigan testified that during the undercover operation, he learned that the Boss, Raymond J. Patriarca, had stated that Family members were not to traffic in narcotics. *See* Defendant's Proffer As To Limoli Murder Allegation, filed on April 23, 1992, p. 6, *citing United States v. DiGiacomo*, Tr., June 25, 1990, p. 79. This was not a direction that was always followed in the Patriarca Family. It did, however, give Robert Carrozza a motive for not telling the defendant he wanted Mantia's money to purchase drugs.

In addition, Philip Leonetti testified that the LCN nationally had a rule against members dealing drugs. *See* Leonetti Test., May 19, 1992. In 1985, Paul Castellano was the Boss of the Gambino Family in New York. *Id.* According to Leonetti, Castellano was serious about enforcing the rule against drug dealing. *Id.* Members of the Gambino Family who dealt drugs in that period risked death if Castellano found out. *Id.; see also United States v. John Gotti, et al.*, Superseding Indictment, p. 6, Exhibit 5, Index to Defendant's Proffer as to Limoli Murder Allegation, filed April 29, 1992. Carrozza allegedly wanted money to deal drugs with Joseph Covello, also known as "Deemis," a member of the Gambino Family. In view of Castellano's rule, I find that Deemis would not have wanted Castellano to know that he was dealing drugs.

Thus, contrary to the so-called rule that Leonetti described, *id*, I find that Castellano and Raymond J. Patriarca did not, as the Bosses of two Mafia Families, consult before Carrozza and "Deemis" did business. Indeed, Carrozza told DeMarco that he would meet with "Deemis'" superior himself. He did not say that Patriarca, as the Boss, would meet with "Deemis'" superior. In addition, "Deemis'" position in the Gambino Family gave Carrozza another reason not to tell the defendant that he

would use the proceeds of the Mantia extortion for drug dealing.

Moreover, as I will describe in more detail in the analysis concerning departures, the defendant was a weak Mafia Boss, particularly with regard to the Patriarca Family in Boston. He had limited knowledge or control over the Boston members.

So, I find that the Count 31 travel was in furtherance of extortion, not narcotics, and that any drug dealing by Robert Carrozza relating to the Mantia extortion was not relevant conduct regarding the defendant Raymond J. Patriarca because it was not in the scope of his conspiratorial agreement with Carrozza and not a reasonably foreseeable consequence of it.

Rather, the dispute concerning Count 31 is similar to the clarifying illustration found in Application Note 2c1 to § 1B1.3 in the proposed amendment the Sentencing Commission sent to Congress on April 30, 1991. *See* U.S.S.G. § 1B1.3, (comment, proposed note 2c1), 57 Fed.Reg. 20149 (May 11, 1992). In an effort to clarify this area of the law, the Sentencing Commission now proposes that the Guidelines Manual include additional illustrations. This particular illustration indicates that if a defendant was paid a small amount of money to forge an $800 check, and unknown to him a co-conspirator used the check for a $15,000 fraud, the defendant would be responsible only for $800 in the Guidelines calculation, not $15,000, because the fraudulent scheme to get the $15,000 was not in furtherance of the criminal activity he jointly undertook with his co-conspirator. *Id.* Similarly, I find that any drug dealing with "Deemis" in which Carrozza engaged was not in furtherance of the unlawful activity jointly undertaken by Raymond J. Patriarca and Robert Carrozza.

Applying these principles to Count 36, which corresponds to predicate act F–8, the August 9 or 10, 1989, travel to Connecticut by Gugliemetti, I find that the defendant's objection to the Probation Department's recommendations is without merit. *See* Presentence Report, ¶¶ 62–75, pp. 25–29. The Presentence Report properly rates the travel in furtherance of extortion, among other things. Extortion is the highest rated activity proven regarding Count 36. Thus, it is appropriate to start with a Base Offense Level of 20.

More specifically, the defendant is correct that the defendant caused Gugliemetti to travel to Connecticut and that travel related in part to the structure of the Family. That travel, the evidence indicates, was necessary to discuss how the Patriarca Family would operate in Connecticut after Grasso's death. Among the issues to be discussed was whether a new Capo would be appointed.

Members of the Patriarca Family were told in the course of that travel by Gugliemetti that they would have to report to Rhode Island and no new Capo would be appointed. *Id.*, ¶ 71, p. 27. The Connecticut Family members were also told that all proceeds of "old business" was to be turned into Rhode Island, which would then return a percentage to Family members in Connecticut. Electronic surveillance of the Patriarca Family soldier Louis Failla's automobile demonstrates that this included proceeds of loansharking, a major element of the criminal business of the Patriarca Family in Connecticut. *Id.; see also* Government's Factual Submission Concerning Relevant Conduct, p. 22, Tr. 197.4, August 10, 1989.

Consistent with this, John Castagna, an associate of the Patriarca Family in Connecticut, was told in August that after Grasso's death, money which was owed to Grasso, including loansharking proceeds, had to be turned over to the Patriarca Family in Rhode Island. *See* Affidavit of John Castagna, ("Castagna Aff."), filed on April 23, 1992, ¶ 4.

The evidence causes me to infer that when the defendant sent Gugliemetti to Connecticut to have money previously paid to Grasso sent to Rhode Island, he knew that some of the money related to loansharking and specifically intended to manage the distribution of that money in violation of 18 U.S.C. § 1952(a)(3).

With regard to Count 39, pertaining to the October 29, 1989 travel to Massachusetts for the Mafia induction ceremony, the

Court finds that in material respects, the government's objection to the rating of the Presentence Report is meritorious. *See* Government's Objection # 2; Presentence Report, pp. 76–77. The travel should be rated as intended to promote gambling or extortion, either Base Offense Level 12 or 20.

All of the evidence that I have been exposed to in the year and a half I have been involved in this case indicates that the principal businesses of the Patriarca Family in Massachusetts were loansharking and gambling. The purpose of the induction ceremony was to "make" new members in order to increase the Patriarca Family's ability to conduct that business. At the Mafia induction ceremony, the defendant personally said that: "all business deals, legal or illegal, should be brought to the table." *See* Exhibit 4B, Tr., October 29, 1989, p. 12. When he said this, he was referring to loansharking transactions, among other business. Thus, although the defendant was not present, it was certainly foreseeable that some members would discuss loansharking at Guild Street, as Gaetano Milano, Louis Failla, and Joseph Russo did. *See* Presentence Report, ¶ 90, pp. 37–41.

Therefore, I find that it is most appropriate to rate Count 39 as a Base Offense Level 20. However, even if it is rated as a Level 12, this has the effect under the Guidelines of escalating the total Offense Level to 27 as a result of the rulings I have made concerning Counts 31, 36 and 39. *See* U.S.S.G. § 3D1.1 "Procedure for Determining Offense Level on Multiple Counts."

As I indicated earlier, there were no objections to the Presentence Report ratings of Counts 30 and 38.

\* \* \* \* \* \*

## V. *The Scope of the Defendant's Relevant Conduct.*

■ The next issue analytically relates to what we have spent the most time on in this case—the question whether, as a matter of law, up to seven crimes constitute relevant conduct under § 1B1.3 regarding the RICO Counts, Counts 1 and 2 of the Superseding Indictment. It is the govern-

ment's contention that they do, and that the defendant's Base Offense Level should be calculated to include these alleged crimes.

The first of these alleged crimes is the 1985 murder of Vincent James Limoli. *See* Government's Proffer of Evidence Concerning Sentencing Hearing, filed March 3, 1992, pp. 9–11. Vincent Ferrara was charged concerning the Limoli murder in this case and he pled guilty to committing that crime. *See* Racketeering Act A–3; Count 4; Superseding Indictment, pp. 7; 77. Pasquale Barone was also alleged to have participated in the Limoli murder and is awaiting trial. *See United States v. Pasquale Barone*, Cr. No. 89–289. Patriarca was not charged with the Limoli murder.

The second crime implicated in the relevant conduct and departure analysis is conspiring with Salvatore Michael Caruana, or aiding and abetting the commission of drug crimes by Caruana, prior to Caruana's indictment in 1983. *See* Government's Proffer of Evidence Concerning Sentencing Hearing, pp. 21–23.

The third matter to be considered in this context, the government says, is the harboring of Caruana when he became a fugitive in 1984. *Id.* at 12–15.

The fourth matter is the 1986 murder of Ted Berns, who was believed to be involved with Caruana's wife after Caruana became a fugitive. *Id.*

The fifth matter is conspiring with Robert Carrozza to deal drugs. *Id.* at 15–19. Carrozza was charged with narcotics offenses in this case. *See* Racketeering Acts J–1 through J–4; Counts 51–54; Superseding Indictment, pp. 39–40; 132–35. The Grand Jury in this case did not allege that Patriarca was involved in narcotics offenses.

The sixth event implicated in the relevant conduct analysis, based on the government's theories, is an alleged authorization of the defendant of an attempt to murder Vincent Ferrara in 1989. *See* Government's Proffer of Evidence Concerning Sentencing Hearing, p. 20.

The seventh matter is the contention that the defendant is now criminally responsible for harboring Alphonse Persico, a fugitive member of the Columbo Family, from 1980 to 1987. *Id.* at 20–21.

If the Limoli or Berns murders constitute relevant conduct for which the defendant is responsible, the defendant's Guidelines would include life imprisonment. *See* U.S.S.G. § 2A1.1, "First Degree Murder," comment. (n. 1.) ("The [Sentencing] Commission has concluded that ... life imprisonment is the appropriate punishment for premeditated killing").

The government did not take the position that the defendant would be subject to life in prison if held responsible for the Limoli or Bern murder. The government took the position that the Guidelines would be 292 to 365 months, or 24 to 30 years, if the defendant were proven guilty of the Limoli murder as relevant conduct. Apparently, this position is based on the understanding that murder would start with a Base Offense Level of 43 and would be reduced three levels because the role that Patriarca would have played would have been between "minimal" and "minor." *See* U.S.S.G. § 3B1.2, "Mitigating Role," ("In cases falling between [minimal] and [minor], decrease by 3 levels"). The Guidelines for an Offense Level 40, Criminal History Category I case are 292–365 months in prison.

However, as a factual matter, the government's theory is that the defendant authorized the murders and, indeed, his authorization was necessary. If this were true, he would not have been a minor or minimal participant. He would have been an indispensable participant. Thus, as in the case of Vincent Ferrara, life imprisonment would be the potential sentence.

In any event, the government has previously expressed the view that the defendant should now be sentenced to serve 24 years in prison, representing 292 months, the low end of the Guidelines range as the government calculates it. It is not, however, necessary to compute the Guidelines including the Limoli murder, or any of the other six matters, as relevant conduct, be-cause they are not, as a matter of law, relevant conduct relating to the RICO charges in this case.

The government does not claim that any of the seven alleged crimes at issue constitute relevant conduct relating to the defendant's Travel Act convictions on Counts 31, 36, 38 and 39, which are predicate acts in the RICO charges. *See* Racketeering Acts F–3, F–8, F–10, F–11; Superseding Indictment, pp. 23, 26, 28–9. The government also does not claim, in its voluminous filings, that the seven alleged crimes constitute relevant conduct concerning the defendant's Count 30 conviction for conspiracy to violate the Travel Act. *See* Superseding Indictment, pp. 103–08. The government confirmed several times during the course of various hearings—including on May 18 and 27, 1992—that it was contending that these seven crimes constitute relevant conduct only on Counts 1 and 2, the RICO charges. Any claim that any or all of those crimes constitute relevant conduct regarding Count 30 was waived by the government. Nevertheless, I have considered whether such a claim might have any merit. Notwithstanding the waiver, I find that any such claim would not be meritorious as a matter of fact and as a matter of law. The seven crimes mentioned are not among the overt acts in Count 30 and the travel alleged in Count 30 does not relate to any of those seven crimes.

The government's position regarding relevant conduct has a certain superficial appeal, but when analyzed it is incorrect. The essence of the government's position is as follows. The defendant stands convicted on charges of violating the RICO statute and for being a member of a RICO conspiracy. The Limoli murder and other crimes, the government says, are within the scope of that RICO conspiracy and reasonably foreseeable consequences of it. The government then argues that the defendant, as Boss of the RICO enterprise, was responsible for the acts of his subordinates, so he should be punished for those acts at this point. The government also claims that at least circumstantial evidence demonstrates that the defendant was per-

sonally involved in each of the crimes that the government claims constitute relevant conduct. *See, e.g.,* Government's Sentencing Memorandum, filed February 26, 1992, pp. 13–17.

This is different than the position that the government took in the sentencing of DiGiacomo and his co-defendants. It is also different than the position the government took in the sentencing of Joseph Russo and his co-defendants, *see* Carrozza Order, May 7, 1992, pp. 6–7. In addition, it is different than the statements the government made prior to the plea in this case. *See* Tr., November 19, 1991, p. 8. As I suggested earlier, on this analysis Spagnolo and Carrozza could arguably have been punished for having roles in the Limoli murder, if it was indeed part of the Patriarca Family RICO conspiracy and reasonably foreseeable, because they had some personal involvement in the events leading up to that murder. *See DiGiacomo,* 746 F.Supp. at 1187.

I want to be as explicit as I can be, however, that I am not relying on any principle of judicial estoppel or any desire to treat co-defendants equally in deciding that the events on which the government seeks to rely do not constitute relevant conduct as to this defendant in this case. *See United States v. Wogan,* 938 F.2d 1446, 1448 (1st Cir.), *cert. denied,* —— U.S. ——, 112 S.Ct. 441, 116 L.Ed.2d 460 (1991) (inequality in sentencing outcome for similarly situated co-defendant, without more, does not justify a departure from a properly calculated Guidelines range); *see also United States v. Levasseur,* 846 F.2d 786, 793 (1st Cir.), *cert. denied,* 488 U.S. 894, 109 S.Ct. 232, 102 L.Ed.2d 222 (1988) (First Circuit expressly declines to decide whether doctrine of judicial estoppel can operate against the government in criminal cases); *Patriot Cinemas Inc. v. General Cinema*

*Corp.,* 834 F.2d 208, 212 (1st Cir.1987) (party in civil case may be precluded from asserting a position inconsistent with a position he or she took in an earlier proceeding if litigant is "playing fast and loose with the courts").

As the Sentencing Commission has attempted to make increasingly clear, relevant conduct of co-conspirators for the purposes of sentencing is not necessarily determined pursuant to the principles that pertain to guilt articulated by the United States Supreme Court in *Pinkerton v. United States,* 328 U.S. 640, 66 S.Ct. 1180, 90 L.Ed. 1489 (1946) (proof of membership in a criminal conspiracy is sufficient to establish criminal liability not only as co-conspirator, but also for all offenses committed in furtherance of conspiracy under 18 U.S.C. § 371). The 1991 Guidelines Manual, in Application Note 1 to § 1B1.3, indicates that relevant conduct may not be identical for all co-conspirators. *See* U.S.S.G. § 1B1.3, comment. (n. 1). In the Amendments that the Sentencing Commission sent to Congress on April 30, 1992, the Sentencing Commission attempts to clarify this further. Proposed Application Note 1 is revised to state explicitly, "[t]he principles and limits of sentencing accountability [under § 1B1.3] are not always the same as the principles and limits of criminal liability." *See* U.S.S.G. § 1B1.3, comment. (n. 1) (proposed), 57 Fed.Reg. 20148 (May 11, 1992). In addition, this point is reiterated and amplified by the Chairman of the Sentencing Commission, Judge William Wilkins, and the General Counsel of the Sentencing Commission, John Steer, in their article on the Guidelines and relevant conduct which appears in the South Carolina Law Review. *See* Wilkins & Steer, *Relevant Conduct: The Cornerstone of the Federal Sentencing Guidelines,* 41 S.C.L.Rev. 495, 508–10 (1990).[1]

---

**1.** The Court of Appeals for the First Circuit has found that: "In the context of a conspiracy, the proper inquiry in determining whether … additional acts should be included as relevant conduct is whether those acts were reasonably foreseeable by the defendant and committed in furtherance of the conspiracy." *United States v. Garcia,* 954 F.2d 12, 15 (1st Cir.1992), citing

*Pinkerton, supra.* This holding relied expressly on the then existing Application Note 1 to § 1B1.3(a)(1), *id.,* which is now being revised to clarify that the Sentencing Commission did not intend that the principles of *Pinkerton* always be applied at sentencing in a conventional conspiracy case. Thus, the clarification of Application Note 1 may cause the Court of Appeals for the

The issue here is one of statutory interpretation. The threshold question is: "What do the Guidelines intend to be conduct punishable in a RICO case absent a departure?" Or, to use the rhetoric of the Guidelines: "What is the Base Offense Level for the defendant in this RICO case?" I find that the Guidelines express the intention that in this case Patriarca's Base Offense Level is to be calculated on the basis of: the Travel Act charges to which he pled guilty; any relevant conduct relating to those charges; any appropriate adjustment for his role in the offense; and any departures warranted under § 5K2.0. As I will discuss later, any departure under § 4A1.3 would affect the defendant's Criminal History Category, but not his Base Offense Level.

U.S.S.G. § 1B1.2 provides basic introductory rules for determining the applicable Guidelines for a defendant. The Guidelines sections which follow § 1B1.2 implement and operate consistently with those rules.

With regard to the calculations of the Offense Level, § 1B1.2(a) directs the court to determine the offense Guidelines section most applicable to the count of conviction. In this case, that section is § 2E1.1, which concerns the RICO statute. Section 1B1.2(b) says that you then determine the applicable Guidelines in accordance with § 1B1.3 concerning relevant conduct. Section 2E1.1 operates consistently with this instruction. The Guidelines says that the Base Offense Level for RICO is either the greater of 19 or "the offense level applicable to the underlying racketeering activity." U.S.S.G. § 2E1.1(a)(2). Thus, § 2E1.1 specifies more than one Base Offense Level for a RICO conviction.

Where, as here, a Guidelines section specifies more than one Base Offense Level, § 1B1.3(a) requires that the proper *Base* Offense Level be determined by the inclusion of what that section defines as relevant conduct. Section 1B1.3(a) expressly applies to determining the *Base* Offense Level when a Guidelines section "specifies more than one [possible] base offense level" and requires that the court include relevant conduct in that calculation. U.S.S.G. § 1B1.3(a)(i). Section 2E1.1(a) also addresses determining the Base Offense Level. Thus, relevant conduct is included in the calculation of the Base Offense Level for RICO violations under § 2E1.1.

The key question for present purposes is the meaning of the term "underlying racketeering activity" as that term is used in § 2E1.1(a)(2). More specifically, does it mean the racketeering activity with which the defendant is personally charged and relevant conduct relating to that activity? In this case, that would be the defendant's RICO predicate racketeering acts and substantive counts of conviction, which are all based on the Travel Act, and relevant conduct related to those Travel Act violations.

The best example of this is the question whether the drug dealing by Carrozza with "Deemis" constituted relevant conduct relating to the defendant's Travel Act violation in Count 31. *See* Superseding Indictment, p. 109. As a matter of law, such drug dealing could constitute relevant conduct. However, I have not included it here, as I said earlier, because the government

---

First Circuit to provide further guidance on this issue in a future case.

More importantly, there is a substantial question whether *Pinkerton* applies to determining guilt when, as here, a *RICO* conspiracy has been alleged. Indeed, the Department of Justice instructs its prosecutors that: "[N]o courts have expressly held *Pinkerton* applicable in connection with a RICO conspiracy ... and the combination of RICO and *Pinkerton* could lead to unwarranted extensions of criminal liability." *See Department of Justice Manual* § 9–110A.100 (1991–1 Supplement) pp. 97–8, citing *United States v. Neapolitan*, 791 F.2d 489, 504–05 n. 7 (7th Cir.), *cert. denied*, 479 U.S. 940, 107 S.Ct. 422, 93 L.Ed.2d 372 (1986) and *United States v.*

*Cryan*, 490 F.Supp. 1234 (D.N.J.), *aff'd*, 636 F.2d 1211 (3rd Cir.1980); *but see United States v. Caliendo*, 910 F.2d 429, 437 (7th Cir.1990).

It is, however, not necessary to decide in this case whether *Pinkerton* applies to determining guilt in a RICO case. Regardless of the answer to this question, for the reasons described in this decision, the Guidelines manifest the Sentencing Commission's intent that for the purposes of imposing punishment in a RICO case, the defendant shall be responsible only for all acts with which he was charged and relevant conduct relating to those acts, rather than for all of the reasonably foreseeable acts of his RICO co-conspirators.

has failed to prove the facts relating to Patriarca which are necessary to establish this drug dealing as relevant conduct as to him. *See, supra,* pp. 182–83.

Alternatively, the phrase "underlying racketeering activity" could, as the government now argues, refer to the racketeering acts of the defendant's RICO co-conspirators. I find § 2E1.1 to be somewhat ambiguous regarding the meaning of the phrase "underlying racketeering activity." It would be clearer if the Sentencing Commission had expressed its intention by saying that the Base Offense Level should be computed on the basis of all acts with which the defendant was charged and all relevant conduct relating to those acts. I also find, however, that this is what § 2E1.1 means.

To interpret § 2E1.1 properly, it must be viewed in the context of the Guidelines as a whole. As Felix Frankfurter wrote: "Frequently the sense of a word cannot be got except by fashioning a mosaic of significance out of the innuendos of disjointed bits of statute." F. Frankfurter, "The Reading of Statutes," *Of Law and Men: Papers and Addresses of Felix Frankfurter,* 59 (P. Elman, ed. 1956). As Justice Benjamin Cardozo put it: "[t]he meaning of a statute is to be looked for not in any single section, but in all the parts together and in relation to the end in view." *Panama Refining Co. v. Ryan,* 293 U.S. 388, 433, 439, 55 S.Ct. 241, 253, 256, 79 L.Ed. 446 (1935) (dissenting). Similarly, as Justice Oliver Wendell Holmes, Jr. said: "[t]he general purpose is a more important aid to the meaning than any rule which grammar or formal logic may lay down," *see United States v. Whitridge,* 197 U.S. 135, 143, 25 S.Ct. 406, 408, 49 L.Ed. 696 (1905), and judges are "apt to err by sticking too closely to the words of a law, when those words import a policy that goes beyond them." *See Olmstead v. United States,* 277 U.S. 438, 469, 48 S.Ct. 564, 575, 72 L.Ed. 944 (1928) (dissenting).

In this case there are three related principles expressly employed in developing the Guidelines which indicate that the Base Offense Level for a RICO conviction is to be calculated on the basis of acts with which the defendant was charged and relevant conduct relating to those acts. These three principles are: (1) the Guidelines are primarily a "charge offense" system; (2) the Guidelines are generally intended to duplicate nationwide past practice; and (3) the Guidelines are intended to establish a sentencing system which is both administratively workable and fair.

The conclusion that the Guidelines do not intend to provide punishment of the defendant for the Limoli murder and other uncharged crimes in this case is reinforced by the principle that where statutory language is truly ambiguous, "courts should construe statutes to avoid decision as to their constitutionality." *United States v. Monsanto,* 491 U.S. 600, 611, 109 S.Ct. 2657, 2664, 105 L.Ed.2d 512 (1989). As I will describe, the government's interpretation of relevant conduct in this case raises serious due process questions. *See e.g. McMillan v. Pennsylvania,* 477 U.S. 79, 85, 106 S.Ct. 2411, 2415, 91 L.Ed.2d 67 (1986) ("there are obviously constitutional limits [concerning sentencing] beyond which the States may not go ...") I do not infer from the words of the Guidelines that the Sentencing Commission intended to test and perhaps exceed constitutional limits in its § 2E1.1 RICO Guidelines. I believe that if the Sentencing Commission intends such an expansive application of § 2E1.1, it should say so plainly. The courts will then be compelled to decide the substantial constitutional questions suggested by this case.

Looking at all parts of the Guidelines Manual together and in relation to their stated principles and purposes involves considering the Manual, the relevant cases, and the scholarly commentary. We can get particular guidance in the First Circuit because Chief Judge Stephen Breyer served on the Sentencing Commission which authored the Guidelines; has written relevant opinions such as *United States v. Blanco,* 888 F.2d 907, 911 (1st Cir.1989); and has written scholarly articles like the Hofstra law review piece which is cited and adopted in *Blanco, see* 888 F.2d at 911; S. Breyer, *The Federal Sentencing Guide-*

*lines and the Key Compromises Upon Which They Rest*, 17 Hofstra L.Rev. 1 (1988). We also have the benefit of the Wilkins and Steer article in the South Carolina Law Review. Wilkins & Steer, *Relevant Conduct: The Cornerstone of the Federal Sentencing Guidelines, supra.*

Considering the language and structure of § 2E1.1, the relevant cases, and the scholarly commentary indicates the following with regard to the general purposes of the Guidelines. First, the Sentencing Guidelines are closer to a "charge offense" system than a "real offense" system of punishment. U.S.S.G. Ch. 1. Pt. A, 4(a), p. 5 (In the Guidelines submitted to Congress "the Commission moved closer to a charge offense system" than a pure real offense system); *see also Blanco*, 888 F.2d at 909–10 ("[T]he Sentencing Commission made [a compromise] among considerations that favor a 'real offense' sentencing system and those that favor a 'charge offense' system.... The Commission's compromise in the guidelines provides that, for the most part, the court will determine the *applicable guideline* by looking to the charge of which the offender was convicted") (emphasis in original); Breyer, *The Federal Sentencing Guidelines*, 17 Hofstra L.Rev. at 7–11. As the Sentencing Commission stated in the Guidelines Manual: "the defendant's actual conduct (that which the prosecutor can prove in court) imposes a natural limit on the prosecutor's ability to increase a defendant's sentence." U.S.S.G. Ch. 1. Pt. A, 4(a), p. 5.

The second relevant general purpose of the Guidelines is that, with some specified exceptions, the Guidelines are intended to duplicate national averages of pre-Guidelines sentencing practices. U.S.S.G. Ch. 1. Pt. A, 4(g), p. 9; *see also Blanco*, 888 F.2d at 910; Breyer, *The Federal Sentencing Guidelines*, 17 Hofstra L.Rev. at 7; 17. More specifically, "the distinction that the Guidelines make in terms of punishment are primarily those which past practices [showed] were actually important factors in pre-Guideline sentencing." Breyer, *The Federal Sentencing Guidelines*, 17 Hofstra L.Rev. at 17; *see also* U.S.S.G. Ch. 1. Pt. A, 4(g), "Sentencing Ranges," p. 9

("While the Commission has not considered itself bound by pre-guidelines sentencing practice, it has not attempted to develop an entirely new system of sentencing on the basis of theory alone. Guideline sentences, in many instances, will approximate average pre-guidelines practice ...").

With regard to the third generally applicable principle, the compromise approach of using a modified charge offense system with some real offense elements to mirror pre-Guidelines sentencing practice was adopted by the Commission in part so that the sentencing system would not become unwieldy or procedurally unfair. *See* Breyer, *The Federal Sentencing Guidelines*, 17 Hofstra L.Rev. at 17. As the Court of Appeals for the First Circuit has reiterated: "Considerations of procedural fairness and administrative efficiency argued for tying punishment more closely to the facts actually charged or proved at trial." *Blanco*, 888 F.2d at 910.

Thus, when there is not joint criminal activity involved, and if a Guidelines section has no specific offense characteristics, the government must usually charge and prove a distinct offense at trial for the defendant to be properly punished for it at his sentencing. *Id.* Generally, such conduct may not be punished as relevant conduct under § 1B1.3(a)(2) because it was part of the same common scheme or plan as the offense of conviction. *Id.* at 910–911.

As I clearly recognize, this case does not involve § 1B1.3(a)(2). We are instead addressing the concept of relevant conduct under § 1B1.3(a)(1), concerning joint criminal activity which may be broader than that under subsection (a)(2). *Id.* at 911. However, I refer to § 1B1.3(a)(2) and Judge Breyer's analysis of it in the *Blanco* case because the basic principles on which the Guidelines are based are common to those sections and, indeed, to the Guidelines as a whole. *Id.* at 909–11.

Reading the language of § 2E1.1 concerning RICO, and particularly the term "underlying criminal activity" in the context of these general purposes of the

Guidelines indicates the following. Punishment of the defendant now for the Limoli homicide would go beyond the charges against him. Punishing the defendant for the alleged Berns murder or for authorizing a hit on Vincent Ferrara or, indeed, for any of the other matters, including Caruana's drug dealing, goes beyond the charges against anybody in the Superseding Indictment in this case.

The government could have sought the defendant's indictment on those matters. As I described earlier, the evidence in this case makes vividly clear that the government had extensively investigated Raymond J. Patriarca for many years and wanted to obtain his indictment and conviction for legitimate reasons. *See Patriarca*, 776 F.Supp. at 602.

I think the following would be evident to any United States District Judge. Perhaps it is particularly clear to me because for four years I was the Deputy United States Attorney and I reviewed every indictment or proposed indictment in this District. The Department of Justice has guidelines known as the "Principles of Federal Prosecution." They provide generally that:

> The attorney for the Government should commence or recommend prosecution if he believes that the person's conduct constitutes a federal offense and the admissible evidence will be probably be sufficient to obtain and sustain a conviction.

U.S. Dept. of Justice, *Principles of Federal Prosecution*, 5–6 (July, 1980); *see also* Department of Justice Manual, Ch. 23A § 220, "Grounds for Commencing or Declining Prosecution," (1990) (same). Within the period that we have been engaged in this case, the then United States Attorney, Wayne Budd, confirmed that this remains one of the standards for federal prosecution nationally and in this District.

The government did not indict the defendant with Salvatore Michael Caruana in 1983. Caruana has since become a fugitive. Nor did the government obtain an indictment against the defendant with Vincent Ferrara regarding the Limoli murder, which is part of the charges in this case. Nor was the defendant charged with others

concerning the Berns murder in the *Bianco* case. I infer that at the time of those indictments the government did not feel it had admissible evidence sufficient to secure the defendant's conviction and punishment for those matters.

In addition, the government did not in this case charge the defendant with any Travel Act or other crimes except RICO as to which the Limoli, Berns and Caruana matters, or the alleged Ferrara "hit," could even arguably be considered relevant conduct. Again, this suggests to me that at the time of the charges, the government did not feel that it could prove the defendant was part of any conventional conspiracy, under 18 U.S.C. § 371, with those alleged acts as part of the conspiratorial agreement or as reasonably foreseeable consequences of any such conspiracy.

Moreover, if the Guidelines intended to authorize punishment for these alleged crimes under § 2E1.2, they would dramatically depart from past practice. There is apparently no pre-Guidelines RICO case in which the defendant was sentenced and punished for an uncharged murder. I asked the government several times if it could bring such a case to my attention. After doing more research, supplementary filings were made.

The only case to which the government referred was the Second Circuit 1987 decision in *United States v. Lee*, 818 F.2d 1052 (2nd Cir.), *cert. denied*, 484 U.S. 956, 108 S.Ct. 350, 98 L.Ed.2d 376 (1987). In *Lee*, the defendant was charged with five predicate acts, including the murder of two men. *Id.* at 1054. The defendant pled guilty to the RICO charges, but admitted committing only two of the predicate racketeering acts, not including the double murder. *Id.* The government at sentencing, however, relied on the double murder alleged in the indictment, which the Court found at sentencing to be adequately proven. *Id. Lee* is simply a case that indicates that prior to the Guidelines, a defendant could not, without the consent of the government, plead guilty to some allegations in an indictment and thereby limit his punishment to those allegations. That is a principle that I rec-

ognized when I took the defendant's plea in this case.

The government also mentioned *United States v. Finestone*, 816 F.2d 583 (11th Cir.), *cert. denied*, 484 U.S. 948, 108 S.Ct. 338, 98 L.Ed.2d 365 (1987). As the government acknowledges, *Finestone* is not a sentencing case. It is a case where an uncharged murder was admitted in evidence in a RICO prosecution. The issue addressed by the Court of Appeals was its admissibility under Federal Rule of Evidence 403. *Id.* at 585–87.

In addition, there is no Guidelines RICO case that I have been able to find, or that the government has been able to bring to my attention, which is analogous to what the government is trying to accomplish at this sentencing. For example, the Fifth Circuit decision in *United States v. Paden* involved, in pertinent part, the Travel Act statute, alleging a conspiracy to violate 18 U.S.C. § 1952(a)(3). *United States v. Paden*, 908 F.2d 1229 (5th Cir.1990), *cert. denied*, 498 U.S. 1039, 111 S.Ct. 710, 112 L.Ed.2d 699 (1991). That case involved a Travel Act conspiracy to commit arson and insurance fraud. The death of a firefighter was counted at sentencing. *Id.* at 1233. The judge in that case, however, properly relied on the arson Guideline, § 2K1.4, which makes express provision for cases involving death as a specific offense characteristic of arson. *Id.* at 1238; U.S.S.G. § 2K1.4(c)(1) (providing cross-reference to Ch. 2, Pt. A Guidelines for murder and manslaughter).

\* \* \* \* \* \*

Similarly, in *United States v. Cusack*, 901 F.2d 29 (4th Cir.1990), the defendant was charged with RICO and drug offenses. *Id.* at 30. He pled guilty to the RICO charges. *Id.* at 31. He was punished for the drug offenses charged in the indictment and for uncharged drug transactions as relevant conduct. *Id.* at 32. This case involved § 1B1.3(a)(2) of the Guidelines, the provision dealing with a common scheme or plan. It did not involve § 1B1.3(a)(1), which the government seeks to apply here. Rather, it was a conventional application of § 1B1.3(a)(2) in a drug context. *See, e.g.,*

U.S.S.G. § 1B1.3(a)(2), comment. (n. 7) (backg'd) ("Subsection (a)(2) provides for consideration of a broader range of conduct with respect to one class of offenses, primarily, certain property, tax fraud and drug offenses for which the guidelines depend substantially on quantity ...").

This analysis also applies to *United States v. Sanders*, 929 F.2d 1466 (10th Cir.), *cert. denied*, —— U.S. ——, 112 S.Ct. 143, 116 L.Ed.2d 109 (1991). Again, the defendant was charged with RICO and narcotics violations. *Id.* at 1468. He was sentenced on the RICO and drug conspiracy charges together. The trial court used § 2D1.1(a)(3), regarding drugs, and held the defendant accountable for more than the amount charged because that larger amount was held to be reasonably foreseeable. *Id.* at 1475. Once again, this was a conventional application of the relevant conduct provisions to a drug case. *See, e.g.,* U.S.S.G. § 1B1.3(a)(2), comment. (n. 7) (backg'd).

However, the drug cases and concepts are not very helpful to the government here. They involve distinctly different circumstances. Thus, in view of the foregoing, I find that the government's position is inconsistent with the Guidelines intention to follow past practice unless a clear and conscious decision has been made to alter it.

The government's position is also inconsistent with the Sentencing Commission's intention to set up a system which is not administratively unwieldy. *See* Breyer, *The Federal Sentencing Guidelines*, 17 Hofstra L.Rev. at 17; *Blanco*, 888 F.2d at 910. For example, if the defendant could be punished for the Berns murder in this case, this Court would have to conduct evidentiary hearings lasting weeks or longer to determine the propriety of including that murder as possible relevant conduct, which would take the Guidelines up from a seven year range to life in prison. The same is true with respect to the Limoli murder and various other charges.

I also find that the government's interpretation is inconsistent with the Sentencing Commission's concern for procedural

fairness. In essence, what the government now seeks is to have the defendant punished for murder, among other things, without indictment, trial by jury, application of the rules of evidence, and proof beyond a reasonable doubt. *See* U.S. Const. Am. V; VI. As I will explain shortly, this raises very serious constitutional questions concerning due process. While the due process issue would require further analysis to resolve, punishing the defendant for an uncharged murder in this fashion would certainly be inconsistent with the intention of the Sentencing Commission to assure procedural fairness.

Therefore, in view of the language of § 2E1.1 and § 1B1.3(a), and considered in the context of all parts of the Guidelines Manual, and in relation to the stated purposes of the Guidelines, I find that the Sentencing Commission intended that the Base Offense Level for RICO consist of the Offense Level for the "underlying racketeering activity" with which the defendant was charged in the indictment and any relevant conduct under § 1B1.3(a)(1) relating specifically to those charges. None of the seven alleged events the government now seeks to have treated as relevant conduct meet this standard.

 This interpretation of the Guidelines is reinforced by the Supreme Court's doctrine that courts should construe statutes to avoid decision as to their constitutionality when statutory language is ambiguous. *See Monsanto,* 491 U.S. at 611, 109 S.Ct. at 2664. More specifically, the Supreme Court has held that: "Where an otherwise acceptable construction of a statute would raise serious constitutional problems, the Court will construe the statute to avoid such problems unless such construction is plainly contrary to the intent of [the draftsmen]." *Edward J. DeBartolo Corp. v. Florida Gulf Coast Bldg. & Constr. Trades Council,* 485 U.S. 568, 575, 108 S.Ct. 1392, 1397, 99 L.Ed.2d 645 (1988). This is a corollary of the "fundamental rule of judicial restraint that [courts] will not reach constitutional questions in advance of the necessity of deciding them." *Three Affiliated Tribes of Ft. Berthold Reserva-*

*tion v. Wold Engineering, P.C.,* 467 U.S. 138, 157, 104 S.Ct. 2267, 2279, 81 L.Ed.2d 113 (1984).

There are serious constitutional questions relating to due process raised by the interpretation of Guidelines that the government advocates. As Judge Edward Becker of the Court of Appeals for the Third Circuit succinctly explained in *Kikumura,* there are reasons why due process is usually afforded when facts relevant to sentencing are decided by a judge, not a jury, based on a preponderance of the reliable information presented, without applying rules of evidence. *Kikumura,* 918 F.2d at 1099–1101. These reasons include, but are not limited to, the judgment that a convicted criminal is entitled to less process than a presumptively innocent defendant, *id.* at 1100; the fact that the sentencing decision is rarely ever as crucial as the decision regarding guilt, *see United States v. McDowell,* 888 F.2d 285, 290 (3rd Cir. 1989); and the fact that overburdened trial courts cannot conduct time-consuming hearings, *see Lee,* 818 F.2d at 1057.

However, as Judge Becker found, these considerations do not mean that the usual standards and procedures are sufficient to satisfy due process in every case. *Kikumura,* 918 F.2d at 1101. Rather, as the Supreme Court has indicated, there are constitutional limits to the government's ability to declare which factors regarding punishment shall be decided in the usual way. *See McMillan,* 477 U.S. at 86, 106 S.Ct. at 2416; *In re Winship,* 397 U.S. 358, 361–68, 90 S.Ct. 1068, 1071–74, 25 L.Ed.2d 368 (1970); *Specht v. Patterson,* 386 U.S. 605, 608–11, 87 S.Ct. 1209, 1211–13, 18 L.Ed.2d 326 (1967).

The constitutional problems presented by the government's construction of relevant conduct are brought into focus by comparing the efforts to have the defendant punished for the Berns and Limoli murders as relevant conduct in this case with the Supreme Court decision in *McMillan* as interpreted by the Court of Appeals for the First Circuit in the case of *United States v. Rumney,* 867 F.2d 714, 718 (1st Cir.), *cert. denied,* 491 U.S. 908, 109 S.Ct. 3194, 105

L.Ed.2d 702 (1989). In *McMillan,* state law created a five year mandatory minimum sentence if a defendant brandished a weapon while committing certain felonies. *McMillan,* 477 U.S. at 81, 106 S.Ct. at 2413. The Pennsylvania Legislature in that case explicitly provided that visible possession of a weapon "shall not be an element of the crime." *Id.* at 83, 106 S.Ct. at 2414. The legislation expressly made that consideration a sentencing factor. *Id.*

The Supreme Court held due process did not require trial by a jury or proof beyond a reasonable doubt regarding brandishing a weapon. *Id.* at 91–93, 106 S.Ct. at 2418–19. In a key passage, the Supreme Court explained:

Section 9712, neither alters the maximum penalty for the crime committed nor creates a separate offense calling for a separate penalty; it operates solely to limit the sentencing court's discretion in selecting a penalty within the range already available to it without the special finding of visible possession of a firearm. Section 9712 ups the ante for the defendant only by raising to five years the minimum sentence which may be imposed within the statutory plan. The statute gives no impression of having been tailored to permit the visible possession finding to be a tail which wags the dog of the substantive offense. Petitioners claim that visible possession under the Pennsylvania statute is really an element of the offenses for which they are being punished,—that Pennsylvania has in effect defined a new set of upgraded felonies—would have at least more superficial appeal if a finding of visible possession exposed them to greater or additional punishment. *Cf.* 18 U.S.C. § 2113(d) (providing separate and greater punishment for bank robberies accomplished through "use of a dangerous weapon or device"), but it does not.

*Id.* at 87–88, 106 S.Ct. at 2417.

With regard to this case, it should be recognized that § 2E1.1 uses and implements the term "racketeering activity" which is also found in 18 U.S.C. § 1963(a). If the term "underlying racketeering activity" as used in § 2E1.1 has the same meaning as the term "racketeering activity" in 18 U.S.C. § 1963(a), the statutory provision which creates the penalties for RICO violations, counting the Limoli and/or Berns murders at sentencing may have the effect of raising the maximum penalty for the RICO violations here from 20 years to life.

18 U.S.C. § 1963(a) provides for a maximum of a 20 year sentence in a RICO case, or for a life sentence if the violation is based on a racketeering activity for which the maximum penalty includes life imprisonment. As found in computing the Guidelines for Vincent Ferrara earlier in this case, the penalty for murder in this case is life. *See* Carrozza Order, May 7, 1992, p. 7. So, if the term "racketeering activity" in 18 U.S.C. § 1963(a) and in the implementing Guidelines provision, § 2E1.1(a)(2), have the same meaning, counting the uncharged Limoli murder would raise the potential penalty for this defendant to life in prison.

In the *McMillan* case, the Supreme Court indicated this could violate due process. *Id.* The fact that the government is not now advocating a life sentence for the defendant does not qualify this conclusion. The process the defendant is due is not decided by the penalty the government recommends. Indeed, the Guidelines limit the court's discretion in any event and the court might be compelled to impose a life sentence on the defendant if, as a matter of law and fact, the Limoli murder constituted relevant conduct as to Patriarca in this case.

Moreover, in *Rumney,* the First Circuit indicated that *McMillan* held that: "traditional sentencing factors need not be pleaded or proven at trial." *United States v. Rumney,* 867 F.2d at 719, *quoting United States v. Brewer,* 853 F.2d 1319, 1326 (6th Cir.1988). As described earlier, however, punishing this defendant in this case for an uncharged murder would not be providing punishment for a "traditional sentencing factor." *Id.* To the contrary, it appears it would be unprecedented.

If the Sentencing Commission intended to have matters like the Berns and Limoli

murders with their potential life sentences punishable as relevant conduct when the defendant is personally charged only with unrelated Travel Act violations, the Guidelines, to paraphrase the Supreme Court, give the impression of having been tailored to permit "the tail to wag the dog of the substantive offense." *McMillan*, 477 U.S. at 88, 106 S.Ct. at 2417.

As I said earlier, the Guidelines for the acts for which the defendant was charged are 63 to 78 months. If the Limoli and Berns murders are punishable as relevant conduct, the Guidelines would provide punishment for alleged crimes that the Court infers the government believed at the time of the indictment it could not prove at trial, because it evidently did not seek the defendant's indictment on these charges. Thus, including those matters as relevant conduct would not simply be an efficient way of deciding whether the defendant should be held accountable for certain demonstrable crimes; rather, finding them to be relevant conduct would have the effect of providing punishment for crimes the government was incapable of proving properly at trial.

Also, in contrast to *McMillan* and *Rumney*, the facts the government seeks to rely on here are not easy to prove or verify. In *Rumney*, the First Circuit found the existence of three prior felony convictions which compelled a mandatory minimum 15 year sentence to be a sentencing factor, rather than an element to be proved at trial, in part because "the primary rationale for requiring sentencing factors to be submitted to a jury, the necessity of accurate fact-finding, does not apply. Prior convictions are highly verifiable matters of record which need not be subject to jury inquiry." *Rumney*, 867 F.2d at 719, *quoting United States v. Brewer*, 853 F.2d at 1326.

The same is generally true for the visible possession of a weapon requirement triggering the mandatory minimum in the *McMillan* case. *McMillan*, 477 U.S. at 81, 106 S.Ct. at 2413. It would be relatively simple for the judge who heard evidence at trial to make that particular finding. However, it certainly would not be easy for me to determine whether the defendant is re-

sponsible for the alleged murders of Limoli and Berns. These are classic, complicated factual issues that, in our democratic system of justice, juries are called upon to decide.

Thus, I find that serious constitutional questions would have to be decided if the government's interpretation of the applicable Guidelines is correct. As I said earlier, the government's interpretation is not consistent with the policies or goals expressed in the Guidelines. Under the circumstances, I do not construe the relevant ambiguities to require a decision on the serious constitutional questions I have described. Rather, I have interpreted the applicable Guidelines consistent with their terms and with the stated purposes of the Guidelines as a whole.

Contrary to the government's contention, this result is not inconsistent with views concerning relevant conduct expressed by Chairman Wilkins and General Counsel Steer in the South Carolina Law Review. As Wilkins and Steer noted, the authors of the Model Penal Code pointed out that: "law would lose all sense of just proportion if one might, by virtue of his one crime of conspiracy, be held accountable for thousands of additional offenses of which he was completely unaware and which he did not influence." Wilkins & Steer, *Relevant Conduct*, 41 S.C.L.Rev. at 510, *quoting* Model Penal Code § 2.06 comment at 307.

It is true that Messrs. Wilkins and Steer acknowledged that: "such liability might be justified for those who are at the top directing and controlling the entire operation...." *Id.* at 511. However, as I will describe in the analysis concerning departures, although the defendant had the title of Boss of the Patriarca Family, he did not direct and control the activities of the members in Massachusetts or Connecticut. If the government believes it could prove the defendant directed and controlled the Berns and Limoli murders, he could still be indicted in connection with those events.

■ Some of the seven uncharged crimes for which the government says the defendant should now be punished could, if proven, provide a proper basis for upward

departure. However, as I will explain, with the exception of matters concerning Caruana, the government's contentions have not been proven by a preponderance of the evidence.

As the seven crimes the government relies on do not constitute relevant conduct in this case, it is not necessary to decide many of the other issues the defendant has raised. These issues include, but are not limited to: whether any such relevant conduct must in this case be proven by a preponderance of the evidence, clear and convincing evidence, or beyond a reasonable doubt, *see Kikumura,* 918 F.2d at 1102; whether the relevant conduct section of the Guidelines exceeds the Sentencing Commission's statutory authority, *see United States v. Galloway,* 943 F.2d 897 (8th Cir.1991), *vacated* (en banc); whether the crimes at issue with regard to relevant conduct were within the scope of the defendant's conspiracy and/or reasonably foreseeable consequences of it, *see* U.S.S.G. § 1B1.3(a)(2), comment. (n. 1); the extent to which the *Pinkerton* theory of liability applies at sentencing in a RICO case; whether punishment for this defendant for these seven matters as relevant conduct would violate his rights to due process and not to be subject *ex post facto* laws, *see Kikumura,* 918 F.2d at 1102; *but see United States v. Restrepo,* 946 F.2d 654, 656–61 (9th Cir. 1991), *cert. denied,* — U.S. —, 112 S.Ct. 1564, 118 L.Ed.2d 211 (1992); and, finally, whether the government is precluded by its prior conduct from obtaining punishment of the defendant for these matters as relevant conduct, *see Levasseur,* 846 F.2d at 793; *Patriot Cinemas,* 834 F.2d at 212.

If this case is reviewed and remanded because the relevant conduct analysis I have just explained is deemed to be incorrect, I will address those remaining issues. It is not necessary or appropriate to do that now.

\* \* \* \* \* \*

## VI. *Departures.*

Recognition of the legal standards that define and limit the authority to depart is important. With regard to departures, those standards and limits begin with 18 U.S.C. § 3553(b), which states that the court shall impose a sentence in the Guidelines range "unless the court finds there exists an aggravating or mitigating factor of a kind or to a degree not adequately taken into account by the Sentencing Commission that should result in a sentence different than that described."

The first issue then is whether there is a factor not adequately considered by the Sentencing Commission. Such factors have been recognized to fall into two possible categories. The first is a qualitative circumstance not considered at all by the Sentencing Commission. *See United States v. Citro,* 938 F.2d 1431, 1440 (1st Cir.1991), *cert. denied,* — U.S. —, 112 S.Ct. 902, 116 L.Ed.2d 804 (1992); *United States v. Sklar,* 920 F.2d 107, 115 n. 7 (1st Cir.1990). The second involves circumstances which, though considered by the Sentencing Commission, are present to a degree or weight neither readily envisioned nor frequently seen in connection with the offense of conviction or the offender. *Citro,* 938 F.2d at 1440; *Sklar,* 920 F.2d at 115 n. 7.

If such a factor not adequately considered exists, the court must then also decide whether that factor indicates that a sentence outside the Guidelines range should be imposed. This decision must be made in the context of the requirement of 18 U.S.C. § 3553(a) that: "[t]he court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes of sentencing as set forth [in the statute]."

There are two provisions of the Guidelines which implement 18 U.S.C. § 3553(b) regarding departures. Section 5K2.0 is the general departure provision and tracks the language of 18 U.S.C. § 3553(b). Section 4A1.3 specifically relates to the adequacy of a defendant's criminal history. It allows the court to consider a departure "[i]f reliable information indicates that the [defendant's] criminal history category does not adequately reflect the seriousness of the defendant's past criminal conduct or the likelihood that the defendant will commit other crimes." U.S.S.G. § 4A1.3, p.s.

Section 4A1.3 suggests that the court may consider, among other things, "prior similar adult criminal conduct not resulting in a criminal conviction." U.S.S.G. § 4A1.3(e). Although the language of § 4A1.3 is not as explicit as that of § 5K2.0, § 4A1.3 is also subject to the 18 U.S.C. § 3553(b) requirement that even if the defendant's criminal history is understated, departure is not appropriate unless the court finds that this understatement should result in a sentence outside the Guidelines range. That is why the Guideline specifically says the court "may consider" a departure. U.S.S.G. § 4A1.3, p.s. Section 4A1.3 does not mandate a departure even if the circumstances it describes are found to exist.

Departures under § 5K2.0 and § 4A1.3 generally operate somewhat differently. As the First Circuit has explained, most, if not all, § 5K2.0 departures involve increases or decreases in Offense Levels, involving vertical shifts on the sentencing grid. *United States v. Aymelek*, 926 F.2d 64, 70 (1st Cir.1991). Section 4A1.3 departures based on criminal history, in contrast, involve moving from one Criminal History Category to another, horizontally on the grid. *Id.*

Section 5K2.0 departures are less structured than those under § 4A1.3. *Id.* Section 5K2.0 departures must be within the statutory maximum and be reasonable. *Id.* As the First Circuit has explained: "Section 4A1.3 departures ... are more narrowly cabined, the court being specifically instructed to use 'as a reference the Guidelines range for a defendant with a higher or lower criminal history category as applicable.'" *Id., quoting* U.S.S.G. § 4A1.3, p.s.; *see also United States v. Jackson*, 921 F.2d 985, 991 (10th Cir.1990) (en banc). Nevertheless, the court has some discretion regarding the parameters of a § 4A1.3 departure. The emphasis is on ascertaining a fair and reasonable sentence, but not necessarily with mathematical precision. *Aymelek*, 926 F.2d at 70; *see also United States v. Ocasio*, 914 F.2d 330, 336 (1st Cir.1990).

■ Procedurally, with regard to a departure, the government has the burden of proving facts warranting an upward departure. *Aymelek*, 926 F.2d at 67. Usually, that burden is to prove those facts by a preponderance of the evidence. *Id.* In certain circumstances, as Judge Becker explained in *Kikumura*, a higher standard may be required. *Kikumura*, 918 F.2d at 1099–1101 (applying standard of proof by clear and convincing evidence).

In addition, the court need not apply the rules of evidence. However, information must have sufficient reliability to support its probable accuracy. *Aymelek*, 926 F.2d at 67; U.S.S.G. § 6A1.3, comment., p. 329 ("In determining relevant facts, sentencing judges are not restricted to information that would be admissible at trial. 18 U.S.C. § 3661. Any information may be considered, so long as it has 'sufficient indicia of reliability to support its probable accuracy'"). The court, however, has the discretion to apply the Rules of Evidence to some matters if necessary to insure sufficient reliability.

If a factor important to sentencing is reasonably in dispute, the parties should be allowed to present their own evidence. *See* U.S.S.G. § 6A1.3(a) ("[w]hen any factor important to the sentencing determination is reasonably in dispute, the parties shall be given an opportunity to present information to the court regarding that factor"); Fed.R.Crim.P. 32(c)(3)(A); *Zuleta–Alvarez*, 922 F.2d at 35–36. At times, testimony may be appropriate. *See Zuleta–Alvarez*, 922 F.2d at 35. However, as the First Circuit, among others, has found, factual disputes need not be resolved if the dispute only involves overlapping Guidelines ranges, and the court would, in any event, impose a sentence in that overlapping range. *See United States v. Concemi*, 957 F.2d 942, 953 (1st Cir.1992); *United States v. Bermingham*, 855 F.2d 925, 931–35 (2nd Cir.1988).

■ Consistent with this, I find the court is not required to decide factual disputes regarding departures if disputed facts would not in any event influence the Court to conclude that a sentence outside the

defendant's Guidelines should result, or influence the Court to grant a larger departure. Nevertheless, in the interest of completeness, I have resolved what I understand to be all of the possibly material factual disputes. In so doing, I have applied the foregoing standards to the government's request for departure in this case, including the rule that the government must prove the relevant facts by a preponderance of the evidence.

██ I find that the government has not proved that a departure under § 5K2.0 is warranted. The circumstances that the government relies on for departure are not sufficiently unusual to justify departure, even if they were proven. *Aymelek*, 926 F.2d at 69. Stated differently, the circumstances the government relies on for departure were adequately considered by the Sentencing Commission in developing the RICO Guideline, § 2E1.2. *See* 18 U.S.C. § 3553(b) ("In determining whether a circumstance was adequately taken into consideration [by the Sentencing Commission], the court shall consider only the sentencing guidelines, policy statements, and official commentary of the Sentencing Commission"). The circumstances the government relies on for an upward departure include: the involvement of the Mafia in this case; the defendant's role as Boss of a Mafia Family; and the types of crimes that the government wishes to prove that the defendant was involved in—murder, drugs and harboring fugitives.

In addition, the government has not proven with regard to this defendant that any of the adequately considered circumstances are present to a degree or weight not readily envisioned or frequently seen in connection with the offender or the RICO offense. *See Citro*, 938 F.2d at 1440. If anything, the defendant lacked the degree of power and involvement usually associated with a Mafia Boss.

More specifically, departure is not warranted here because this RICO case involves a LCN Family which engaged in murder, drug dealing or harboring fugitives, among other things. As the First Circuit said in *United States v. Angiulo*, a case involving other members of the Patriarca Family:

> If anything is clear about RICO, it is that it is intended to encompass the activities of organized crime families. The Supreme Court has explicitly noted that in drafting RICO, Congress' main focus was the eradication of organized crime. Given the history behind RICO, we have no doubt that the murder conspiracies and the gambling and loansharking operations for which the defendants were convicted are precisely the type of activity that Congress intended to reach through RICO ... A person of ordinary intelligence could not help but realize that illegal activities of an organized crime family fall within RICO.

*Angiulo*, 897 F.2d at 1179–80; *see also United States v. Turkette*, 452 U.S. 576, 588–93, 101 S.Ct. 2524, 2531–33, 69 L.Ed.2d 246 (1981); *Russello v. United States*, 464 U.S. 16, 25–29, 104 S.Ct. 296, 301–03, 78 L.Ed.2d 17 (1983). In these circumstances, I find that the Sentencing Commission in developing its RICO Guideline clearly considered its application to a LCN crime Family like the Patriarca Family.

The Sentencing Commission also adequately considered the application of the RICO Guideline to an LCN case. More specifically, the Sentencing Commission recognized the inherent seriousness of a RICO violation in establishing a minimum Base Offense Level of 19 for a RICO offense. *See* U.S.S.G. § 2E1.1(a)(1); *United States v. Butt*, 955 F.2d 77, 89 (1st Cir. 1992). This minimum reflects a legislative judgment that RICO violations, because they entail not one criminal act, but a pattern of predicate crimes, warrant a higher Base Offense Level than non-racketeering offenses. *Id.* In this sense, the RICO Guideline addresses the defendant's Mafia membership. The applicability of the RICO Guideline in this case contrasts with the pre-Guidelines case of *United States v. Fatico*, 458 F.Supp. 388, 413 (E.D.N.Y. 1978) (defendant convicted of hijacking of trucks in violation of 18 U.S.C. § 371), and the Guidelines analysis done in *United States v. Schweihs*, 733 F.Supp. 1174,

1178–79 (N.D.Ill.1990) (defendant convicted of extortion, conspiracy to commit extortion, and solicitation of a crime of violence in violation of 18 U.S.C. §§ 1951(a); (b)(2); and 373(a)). In both of these cases, the pattern of criminal acts that LCN membership represents was not implicated in the defendants' counts of conviction. *Fatico*, 458 F.Supp. at 413; *Schweihs*, 733 F.Supp. at 1178–79.[2]

As I indicated in my relevant conduct analysis, the Sentencing Commission reasonably decided to link the Base Offense Level for RICO to the racketeering acts with which the defendant was charged and convicted. To have done otherwise would have raised serious practical and constitutional issues. *See, supra*, pp. 193–96.

The reference by the First Circuit to murder and other crimes as typical RICO racketeering acts is also applicable to drug dealing and harboring fugitives. *See Angiulo*, 897 F.2d at 1179–80. Although Leonetti testified that the LCN generally, and the Patriarca Family in particular, had so-called "rules" against drug dealing by members, drug dealing was not unforeseen by the Sentencing Commission when it developed the RICO Guideline. For example, in this RICO case, Carrozza was charged with drug racketeering acts and narcotics offenses. *See* Superseding Indictment, Counts 51–54, pp. 132–35. In the related case, Spagnolo was similarly charged. *See DiGiacomo*, 746 F.Supp. at 1186. As cases cited by the government concerning relevant conduct, among others, indicate, the application of RICO to narcotics enterprises is not unusual. *See Cusack, supra;*

*Sanders, supra; Finestone, supra; United States v. Monsanto*, 836 F.2d 74 (2nd Cir.1987); *United States v. Turkette*, 632 F.2d 896 (1st Cir.1980).

Similarly, as the government pointed out in the bail litigation in this case and in the *DiGiacomo* case, a meaningful number of LCN members have become fugitives, including Patriarca's co-defendant Angelo Mercurio. *See Patriarca*, 776 F.Supp. at 597; *DiGiacomo*, 746 F.Supp. at 1187, 1188–89. This, too, was a circumstance clearly foreseeable and adequately considered by the Sentencing Commission. Thus, even if proven, matters such as the Limoli homicide and the Berns homicide, any authorization to attempt to murder Vincent Ferrara, aiding and abetting drug offenses by Caruana, and harboring Alphonse Persico constitute matters adequately considered by the Sentencing Commission.

There are also no circumstances here militating toward an upward departure which exist to an unusual degree. The defendant's role as Boss of the Family is already addressed by § 3B1.1(a), which provides for a four level increase for a leader of criminal activity which involved five or more participants. Without objection from the defendant, he has been given this four level increase for all of the offenses of which he now stands convicted.

The defendant did not, however, exert leadership and power to a degree which is unusual in a criminal organization. Indeed, Application Note 3 to § 3B1.1 suggests a four level adjustment may be more than would be appropriate if the defendant had placed his role in the offense in dispute.

---

**2.** This Court does not regard the decision in *Schweihs, supra,* to be inconsistent with the conclusion that the Sentencing Commission adequately considered organized crime, and a potential defendant's position in the LCN, in developing its RICO Guideline, § 2E1.1. The district court in *Schweihs* expressly stated: "That Mr. Schweihs was not on trial for being part of organized crime, *as he would have been if he had been indicted under RICO,* does not diminish the role of organized crime in this particular Hobbs Act conviction." *Schweihs,* 733 F.Supp. at 1179. (emphasis added).

Moreover, even if the Sentencing Commission did not adequately consider organized crime, or a defendant's position in the LCN, in developing

its Guidelines for RICO and for a defendant's role in the offense, the Court is not persuaded that either is a factor which should, on the facts of this case, result in a sentence above the Guidelines. *See* 18 U.S.C. § 3553(b); U.S.S.G. § 5K2.0. Rather, in view of the defendant's history as a weak and ambivalent Boss, his demotion to Soldier, his cancer, and the potential for his reincarceration if he violates the terms of his supervised release, the Court finds that the Guidelines, absent a [§ 5K2.0] departure, provide for a sentence which is "sufficient, but not greater than necessary, to comply with the purposes of sentencing as set forth [in the statute]." *See* 18 U.S.C. § 3553(a).

U.S.S.G. § 3B1.1, comment. (n. 3). The Application Note states that:

> In distinguishing a leadership and organizational role from one of mere management or supervision, titles such as "kingpin" or "boss" are not controlling. Factors the court should consider include the exercise of decision-making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others. There can, of course, be more than one person who qualifies as a leader or organizer of a criminal association or conspiracy. This adjustment does not apply to a defendant who merely suggests committing the offense.

U.S.S.G. § 3B1.1, comment. (n. 3).

In this case, although the defendant held the title of "Boss," he did not exercise control or authority over the Boston faction of the Family, including the co-defendants. Rather, as initially reflected in my bail decision, and as I continue to find, the Boston faction generally, and Patriarca's co-defendants particularly, did not consult the defendant on matters in which the Boss would usually be involved, including possible murder. *See Patriarca*, 776 F.Supp. at 601–02. The defendant did not exercise decision-making authority regarding the activities of the Boston faction. The defendant did not regularly profit from the activities of the Boston Family members, although he probably did receive some payments from them. *Id.* Once again, as I mentioned earlier, Spagnolo's experience indicates that the members of the Boston faction were often making little money during the defendant's tenure as Boss. *See DiGiacomo*, 746 F.Supp. at 1184.

As indicated earlier, the government also failed to prove by a preponderance of the evidence that the defendant received immediately or eventually any of the proceeds of the $250,000 extortion of Sagansky and Weinstein. *See* Exhibit 12, Tr., January 15, 1987, pp. 1–22; *see also Patriarca*, 776 F.Supp. at 602. Rather, his co-defendants hoped that extortion could be kept secret from Patriarca, among others. *Id.*

Rather than controlling the Family, Patriarca found the Boston faction to be violently rebellious. Several of his co-defendants caused the shooting of two of Patriarca's close allies, killing Grasso and wounding Salemme, in order to influence the defendant to cede power to them. *See* Presentence Report, ¶¶ 57–61, pp. 24–25; *see also* Trial Brief of the United States, pp. 216–17. Russo directly threatened to kill the defendant in an effort to remove him as Boss. *See* Exhibit 24, Tr., May 15, 1991, Testimony of John Castagna in *United States v. Nicholas Bianco, et al.*, Cr. No. H–90–18, (D.Conn.1991), ("Castagna Test."), p. 48; *see also Patriarca*, 776 F.Supp. at 602. Thus, the Court concludes that the defendant's actual role in the enterprise did not exist to a degree not foreseen or adequately considered by the Sentencing Commission.

Similarly, as set forth in the following analysis, the government has not proven that the defendant was involved in uncharged racketeering acts in a way which would justify an upward departure under § 5K2.0. More specifically, the government has proven by a preponderance of the evidence only that the defendant was involved in the narcotics activities of Salvatore Michael Caruana. The Court assumes for present purposes, without finding, that as part of this the defendant helped Caruana when he became a fugitive. However, these facts are not so extraordinary in kind or degree as to justify increasing the defendant's Offense Level under § 5K2.0. They do, however, justify increasing the defendant's Criminal History Category from I to II pursuant to § 4A1.3(e).

With regard to § 4A1.3, again the government relies on the seven crimes addressed in connection with the relevant conduct analysis. However, as I said, only the defendant's connection to Caruana's drug dealing and, I will assume, flight from trial have been proven by a preponderance of the evidence.

I have studied the voluminous documentary evidence submitted by the defendant. I also listened to testimony on May 18 and 19, 1992, from Leonetti, the former Underboss of the Philadelphia LCN Family now cooperating with the government after getting a 45 year sentence in his own case. I listened to testimony on May 19 and 20, 1992, from Special Agent of the FBI, James Maher. Neither Leonetti nor Maher had any personal knowledge of events at issue. *See* Fed.R.Evid. 701. Both were offered by the government as experts. *See* Fed.R.Evid. 702.

Essentially, the government's theory has been that the LCN is a highly structured organization which has rules; LCN Families nationally follow those rules; the Patriarca Family under the defendant was a typical LCN Family; thus, the Patriarca Family must have followed the LCN rules. One LCN rule is that the Boss must approve murder. Therefore, the government contends, the defendant must have approved the Limoli and Berns murders.

Special Agent Maher also offered to assist the Court in interpreting transcripts of tape recorded conversations. *See* Fed. R.Evid. 702. The First Circuit has recognized that a court has considerable discretion concerning whether to permit a jury to hear expert testimony. *See Angiulo,* 847 F.2d at 975; *Angiulo,* 897 F.2d at 1189. The key question in exercising that discretion is whether such testimony would be helpful to a trier of fact. *Angiulo,* 847 F.2d at 975. In the First Circuit, such testimony has been admitted at trial in cases involving the Patriarca Family primarily to explain the structure and operation of LCN Families and the positions of parties in the Patriarca Family. *See Angiulo,* 847 F.2d at 973; *Angiulo,* 897 F.2d at 1187. This Court has long been persuaded that the LCN generally, and the Patriarca Family particularly, exist and that this defendant succeeded his father as Boss. *See Patriarca,* 776 F.Supp. at 601–03. Expert testimony on these points, therefore, was neither necessary nor helpful.

As the Patriarca Family has been a secret organization, however, I did want to give the government an opportunity to use its experts to attempt to prove that the Patriarca Family had a habit or routine practice in the relevant period which would indicate that the defendant authorized the Limoli murder or was personally involved in other acts the government has relied on for departure. *See* Fed.R.Evid. 406, "Habit; Routine Practice."

On direct examination by the government, both Leonetti and Maher testified consistently with the government's theory in this case. However, their testimony about the Patriarca Family under the defendant being a typical Family which followed LCN rules, including the rule that the Boss must approve murder, was not helpful to the Court from the government's perspective. It was not credible largely because the prosecution gave the expert witnesses only evidence suggesting the typicality of the enterprise. The government failed to provide them important information demonstrating the Patriarca Family's atypicality in the relevant period. *See, e.g.,* Fed.R.Evid. 703; 705. Thus, the witnesses were each like the proverbial blind man who believed that an elephant resembled a snake because he had only felt its tail.

Perhaps ironically, the testimony of Leonetti and Maher had the effect of helping the defendant rather than the government. In its most pertinent part, the testimony demonstrated the wisdom of the Russian author Leo Tolstoy's observation that: "[h]appy families are all alike; but every unhappy family is unhappy in its own way." L. Tolstoy, *Anna Karenina* 1 (Constance Garnett trans. 1933). In this case, I was not persuaded that all happy, or relatively happy, LCN Families operated alike. I was, however, convinced that the Patriarca Family was an unhappy Family, which did not follow the rules in many ways important to this sentencing.

More specifically, with regard to Leonetti's testimony, Leonetti indicated that there are general rules which the LCN Commission hopes every Family will follow. However, in the best of times, and in the happiest of Families, this is not the case. For

example, LCN members are not supposed to deal drugs, but some like Carrozza and Covello did. *See, supra,* pp. 182–83.

Leonetti admitted on cross-examination that he had never met Patriarca. Indeed, he had met only one member of the Patriarca Family in his life and he did not know that person's name. He did not, he said, discuss the Patriarca Family with any member of the New York LCN Commission. He had almost no knowledge, he said, of what happened in New England.

Indeed, the most important thing Leonetti knew about the defendant showed the startling atypicality of the Patriarca Family while the defendant was the Boss. Leonetti had spoken to an individual named Bruno, who was a member of a New York LCN Family which operated in Springfield, Massachusetts. Bruno had a dispute with Billy Grasso, the Underboss of the Patriarca Family in Connecticut. Bruno went to Patriarca, as the Boss of the Patriarca Family, to ask him to direct Grasso to stop extorting victims of loansharking that Bruno felt belonged to him. The defendant responded he could not control Grasso. Leonetti testified that he regarded this as "very unusual." *See* Leonetti Test., May 18, 1992; *see also* Exhibit 1, Affidavit of Philip Leonetti, "Leonetti Aff.," ¶ 4.

Similarly, Leonetti testified that it would be very unusual, indeed a violation of LCN rules, for an Underboss to be killed without the Boss's approval. He had not been told, however, that this is precisely what the government correctly believes occurred with regard to Grasso. *See* Presentence Report, ¶¶ 57–61 pp. 24–25; *see also* Trial Brief of the United States, pp. 216–17. Similarly, Leonetti said he would be very surprised if, as here, there was no evidence of an effort by a Boss to retaliate for the unauthorized shooting of his allies. These are examples of important information not shared with Leonetti, undermining significantly the value of his testimony from the government's perspective.

Leonetti read only part of the transcript of the October 29, 1989 induction ceremony. The essence of Leonetti's testimony, however, concerned that part of the October 29, 1989, induction ceremony which indicated that the Patriarca Family was a typical Family. *See* Exhibit 4B, Tr., October 29, 1989. Although Leonetti, who has testified in many other cases, did not previously claim there was such a rule, he testified here that the LCN rules required a Boss's approval for a murder. *See* Leonetti Test., May 18, 1992; *see also* Leonetti Aff. ¶ 8. Thus, the government argues that the defendant must have authorized the Limoli murder. I find Leonetti's testimony gives no meaningful weight to this contention.

With regard to Special Agent Maher, he had only reviewed certain limited transcripts given to him by the government. *See* Exhibits 5–8, Letters from United States Attorney Jeffrey Auerhahn to James Maher, dated January 10, 1990; October 15, 1990; November 7, 1991; December 17, 1991; *see also* Exhibit 9, "List of cassettes and transcripts reviewed by Agent Maher." Prior to my asking about it, he did not, for example, listen to the tapes or review the transcripts of the recordings of the defendant made in his automobile in 1986. *See* Exhibits 11A, 11B, Tr., February 14, 1986.

Special Agent Maher, however, also opined that the Patriarca Family was a typical LCN Family. *See* Testimony of James Maher, ("Maher Test."), May 20, 1992. Special Agent Maher, however, had not been told that Russo had threatened to kill the defendant, as a government witness, Castagna, testified in Connecticut. *See* Exhibit 24, Castagna Test., May 15, 1991, p. 48. Special Agent Maher said he could not conceive of this occurring. *See* Maher Test., May 20, 1992. I find that it happened, in part because, as I said earlier, the government warned Patriarca of the threat against him in 1989. *See Patriarca,* 776 F.Supp. at 602.

Special Agent Maher also agreed that it would not be typical for an Underboss to be killed without the Boss's approval. *See* Maher Test., May 20, 1992. He also believed it would be a violation of LCN rules for a "made" member like Carrozza to deal drugs. *See* Maher Test., May 20, 1992; *see*

*also* Superseding Indictment, Counts 51–54, pp. 132–35. Basically, as I said, because the information on which Maher, as well as Leonetti, relied was so materially incomplete, his testimony has. on the issue of routine practice had virtually no probative value.

In addition, I did not find Special Agent Maher's interpretation of the tapes to be helpful. After two years of litigation relating to LCN, I am familiar with the jargon. I am capable of reading the transcripts, listening to the tapes, and drawing inferences with the help of argument by counsel. I do not require the kind of expert assistance that Maher offered. With regard to the ambiguities to which the witness testified, I did not find his interpretations to be persuasive.

Virtually all of the tapes that he was asked to address involved events which preceded this defendant becoming the Boss, which the government contends occurred after the death of the defendant's father in July, 1984. *See* Trial Brief of the United States, p. 105. I was willing to listen to the testimony to see if the experts would provide proof that the Patriarca Family had actual practices in the period after the summer of 1984, the time period relevant to the events on which the government relied to justify departures. Practices in an earlier era were not meaningfully probative because of the material changes in the operation of the Family in the mid–1980's. When Raymond L.S. Patriarca died, the Family lost the man who had been a strong Boss. *Id.* As I said earlier, he was succeeded by his son, who was an ambivalent and weak Boss. *See Patriarca*, 776 F.Supp. at 601–02.

In addition, and at least of equal significance, the government in the mid–1970's successfully prosecuted the hierarchy of the Patriarca Family in Massachusetts. *See Angiulo*, 897 F.2d 1169; *Zannino*, 895 F.2d 1; *Angiulo*, 847 F.2d 956. Agent Maher testified that such prosecutions often disrupt the operation of LCN Families. I find that such disruption occurred here. *See Patriarca*, 776 F.Supp. at 601–02.

Essentially, the same analysis applied to the additional information in the government's proffer following Special Agent Maher's testimony. *See* Government's Proffer Concerning the Testimony of Special Agent James T. Maher, filed on May 28, 1992. I doubt that many of those representations, or at least some of those representations, could withstand cross-examination. Again, however, only one of the additional conversations addressed relates to the Patriarca Family in Massachusetts when this defendant was Boss, and that is the conversation concerning the induction ceremony with which I am familiar and capable of interpreting. *Id.* at 16–24.

\* \* \* \* \* \*

As I indicated earlier, with regard to the seven specific alleged crimes that the government has relied on to establish relevant conduct or for an upward departure, I find that the contention that the defendant was involved with Salvatore Michael Caruana in drug dealing has been proven by a preponderance of the evidence. With regard to the other matters, I find that not only have they not been proven by a preponderance of the evidence, but that the information submitted by the government did not place those matters sufficiently in dispute to warrant taking any additional testimony or evidence. *See, e.g.*, U.S.S.G. § 6A1.3(a); Fed.R.Crim.P. 32(c)(3)(A); *Zuleta–Alvarez*, 922 F.2d at 35–36.

The one matter the government relies on that is mentioned in the Superseding Indictment is the Limoli homicide. *See* Government's Proffer of Evidence Concerning Sentencing Hearing, pp. 9–11; Racketeering Act A–3; Count 4; Superseding Indictment, pp. 7; 77. I find that, assuming for the purpose of this sentencing, without deciding, that the Limoli homicide was a racketeering act of the Patriarca Family, the government has not proven by a preponderance of the evidence that the defendant knew about it, or authorized it, or was involved in it in any way. I recognize that Ferrara pled guilty to participating in this crime on behalf of the Patriarca Family. *See* Carrozza Order, May 7, 1992, pp. 3; 7; *see also* Racketeering Act A–3; Count 4;

Superseding Indictment, pp. 7; 77. If, however, it was material to my analysis, I would be obliged to litigate that issue in this sentencing proceeding because Ferrara's admission, coming after the end of his conspiracy with Patriarca, given the defendant's objection, could not properly end the inquiry. *See United States v. Serrano,* 870 F.2d 1, 7–9 (1st Cir.1989) (incriminating out-of-court statement made by co-defendant to investigator not admissible under co-conspirator exception to hearsay rule because statement was made at time when objectives of conspiracy had long since either failed or been achieved); *United States v. Palow,* 777 F.2d 52, 57 (1st Cir.1985) (post-arrest statements not admissible against co-defendant because they were not made in furtherance of conspiracy); *see also Bruton v. United States,* 391 U.S. 123, 135–36, 88 S.Ct. 1620, 1627–28, 20 L.Ed.2d 476 (1968) (admission of co-defendant's confession at joint trial violates a defendant's right to confrontation if confession also implicates defendant). To decide this question, I might have to hear from people like Walter Jordan, a purported participant in the Limoli murder who is now cooperating with the government. However, it is not material and, therefore, not necessary for me to take evidence.

Many of the facts relating to the Limoli homicide I find to be accurately stated in the Presentence Report, except the purported facts regarding the defendant. *See* Presentence Report, ¶¶ 32–54, pp. 16–23; *see also* Government's Proffer of Evidence Concerning Sentencing Hearing, pp. 9–11. Basically, there was extensive electronic surveillance at the time of the Limoli homicide. It and the other evidence indicated that Carrozza, Spagnolo and other Patriarca Family members and associates were directly dealing drugs. Vincent J. Limoli was an associate of Ferrara. Limoli stole drugs he believed belonged to Frank Salemme, with whom he had a dispute, but the drugs actually belonged to Spagnolo.

Spagnolo and Carrozza discussed the recovery of the drugs. Spagnolo suspected Limoli. Spagnolo went to Ferrara. Vincent Ferrara confronted Limoli, who at first denied his involvement. After being threatened, he ultimately admitted the theft. About one month later, Limoli was shot and killed.

In this case, Ferrara pled guilty to causing the murder on behalf of the Patriarca Family. As I indicated earlier, neither Spagnolo nor Carrozza were charged in connection with the Limoli murder, and the government made no effort to have either of them sentenced on the basis of that murder.

The government has not proven by a preponderance of the evidence that the defendant here was consulted about or authorized the Limoli murder. As I have said often, the Boston members did not regularly consult the defendant. Indeed, they tried to hide matters like the Vanessa's extortion from him. *See* Exhibit 12, Tr., January 15, 1987, pp. 1–22; *see also Patriarca,* 776 F.Supp. at 602.

While I hope I have already made this distinction clear enough, the defendant had a stated policy reflecting the LCN rule prohibiting direct drug dealing by members. It is true that rule was often honored in the breach in the Patriarca Family. However, the rule gave the Boston members an incentive not to consult the defendant regarding the Limoli murder, which arose out of a drug transaction with which they were not supposed to be involved. *See, supra,* pp. 182–83.

The extensive electronic surveillance of DeMarco and Carrozza reflects no reference to the defendant in connection with their drug dealing generally or the Limoli murder particularly. In addition, while the government has demonstrated that an impressive array of confidential informants were operating during this period, there was no confidential informant who offered in any information that was made available to me that this defendant was consulted and authorized the Limoli murder. So, I conclude that the government has not proven by a preponderance of the evidence that the defendant conspired in the commission of the Limoli murder, or aided and abetted that murder, or authorized it, or had any personal involvement in it in any way.

Indeed, I find that the government's case here regarding the Limoli matter is much weaker than the its case in *United States v. Cammisano*, 917 F.2d 1057, 1060–62 (8th Cir.1990), where the Court of Appeals for the Eighth Circuit reversed the finding that a defendant was involved in an LCN murder in connection with his sentencing on an obstruction of justice conviction. In *Cammisano,* the government had evidence from intercepted telephone conversations and from confidential informants linking the defendant to a Mafia murder. *Id.* at 1061. The Court of Appeals, however, decided that the evidence was hearsay and insufficiently reliable to provide a basis to find the facts necessary to aggravate the sentence. *Id.* at 1062. In this case, the Court must make its own judgments. However, the evidence of this defendant's involvement in, or responsibility for, the Limoli murder is weaker than the analogous evidence found to be insufficient in *Cammisano.*

With regard to Caruana and drugs, however, the government has proven by a preponderance of the evidence that the defendant was involved in some drug crimes committed by Salvatore Michael Caruana from 1981 to 1983. *See* Government's Factual Submission Concerning Relevant Conduct, pp. 3–12; *see also* Presentence Report, ¶¶ 12; 101, pp. 9; 46. In reaching this conclusion, I rely primarily, if not exclusively, on the electronic surveillance evidence presented. *Id.* Exhibit F. It is not necessary to hear the additional testimony that the government has proffered of witnesses such as Robert Deutsch and Robert Frappier. *See* Government's Proffer Concerning Sentencing Hearing, pp. 21–23.

The defendant was given an opportunity to present evidence, including witnesses he might wish to call. *See United States v. Raymond J. Patriarca,* Order, April 10, 1992, ¶ 2. Nothing was offered or suggested by the defendant. So I consider the record closed and complete. *See Zuleta-Alvarez,* 922 F.2d at 36; *United States v. Shattuck,* 961 F.2d 1012, 1014–15 (1st Cir. 1992).[3]

The electronic surveillance shows, among other things, that the defendant received payments from Caruana for services rendered by the Patriarca Family in connection with his marijuana trafficking. This evidence includes, but is not limited to, the January 27, 1981 transcript which reflects Gennaro Angiulo saying that the defendant asked permission to bring Caruana to 98 Prince Street to meet Angiulo. *See* Government's Factual Submission Concerning Relevant Conduct, Exhibit F, Tr. 60, January 27, 1981, p. 2. The February 14, 1981 transcript of another recorded conversation reflects Gennaro Angiulo discussing a meeting with Caruana concerning drugs. *Id.* Exhibit F, Tr. 190, February 14, 1981, pp. 3; 6. Angiulo, who I find was then in a position to know, says later: "Junior thinks the world of him," referring to Caruana, "Sure, Junior thinks the world of him. He's got 333,000 bucks. That's why he thinks the world of him." *Id.*

Another transcript indicates that on March 10, 1981, Angiulo, too, wanted money from Caruana. *Id.* Exhibit F, Tr. 304(i), March 10, 1981, pp. 1; 10. He asked one of his colleagues whether Caruana had sent any money to him. He was told that nothing had been forthcoming, and he said: "I think I better have a little piece of pie with Mr. Junior because this is getting to

---

**3.** The court has some discretion in deciding whether to provide a party with an evidentiary hearing, including whether to provide another opportunity to introduce evidence to place a matter in dispute or to prove a particular point. *See e.g. Shattuck,* 961 F.2d at 1014–15. As indicated earlier, I exercised this discretion to permit the government to file an affidavit of John DeMarco concerning the Count 31 Travel Act dispute. *See, supra,* p. 183.

As I have found that the Caruana drug matter does not affect Patriarca's Base Offense Level,

but only raises his Criminal History Category 1 overlapping level (generating Guidelines of 78 to 97 months, rather than 70 to 87 months), I have exercised my discretion to deem the record closed on this issue. If, however, Patriarca's involvement in Caruana's drug crimes is, as a matter of law, determined on appeal to constitute possible relevant conduct of Patriarca, which would dramatically increase his Base Offense Level and resulting Guidelines, I will consider further whether to permit him to offer evidence to dispute the uncontested information concerning Caruana on which I have relied.

the point"—and then the transcript indicates that the tape becomes unintelligible. *Id.*

There is evidence in that same transcript that it was the defendant's father, Raymond L.S. Patriarca, who was getting money from Caruana. *Id.* Indeed, I recognize the defendant has asserted that the Caruana-related references in the transcript involve his deceased father, rather than the defendant. However, the contentions are not mutually exclusive. I conclude that both the defendant and his father were criminally involved with some of Caruana's drug crimes.

On August 30, 1983, the electronic surveillance evidence indicates that Ilario Zannino expressed the belief that the defendant would be indicted with Caruana on drug charges. *See* Exhibit 20, Tr., August 25, 1983, p. 1. As I said earlier, the defendant was not indicted with Caruana. I am persuaded, however, by a preponderance of the evidence that he engaged in narcotics violations with Caruana.

For present purposes, I assume, without deciding, that the defendant was also involved in helping to hide Caruana when he became a fugitive as his trial was about to begin in this United States District Court. *See United States v. Salvatore Michael Caruana, et al.,* D.Mass., Cr. No. 83–309–Z. As this assumption has no effect on the Guidelines calculations, it is not necessary or appropriate to take additional evidence on it. *See Concemi,* 957 F.2d at 953; *Bermingham,* 855 F.2d at 931–35.

In my bail decision last year, I found the Patriarca Family assisted Caruana's flight. *See Patriarca,* 776 F.Supp. at 604. As I just said, however, the present assumption that the defendant was personally involved in that effort does not effect the Guidelines calculation. If the defendant had been convicted for harboring Caruana, that would be a conviction relating to his hypothetical conviction for the drug offenses that I have just found proven by a preponderance of the evidence. Under § 4A1.1, these convictions would be counted together, either as part of a common scheme or plan, which they would have been, or because they would have been tried together in one case. *See* U.S.S.G. § 4A1.2(a)(2) ("Prior sentences imposed in related cases are to be treated as one sentence for purposes of § 4A1.1(a), (b) and (c)"); *see also* U.S.S.G. § 4A1.2, comment. (n. 3) ("... prior sentences are considered related if they resulted from offenses that (1) occurred on the same occasion, (2) were part of a single common scheme or plan, or (3) were consolidated for trial or sentencing").

If the defendant had been convicted of conspiring with Caruana to commit drug offenses and of aiding and abetting his flight, and sentenced to more than 13 months in prison, three points would be added to his criminal history score, resulting in a Criminal History Category of II. *See* U.S.S.G. § 4A1.1(a). I am proceeding on the assumption that those convictions occurred and that a departure based on an understatement of the defendant's criminal history is appropriate.

With regard to the murder of Ted Berns, however, even assuming the defendant was involved in efforts of Caruana to flee, the government has not proved by a preponderance of the evidence the defendant is criminally liable for the murder of Ted Berns. *See* Government's Proffer of Evidence Concerning Sentencing Hearing, pp. 12–15. Thus, he should not now be treated as if he had been convicted and be sentenced for it. Nor has the government offered sufficient evidence to put this reasonably in dispute. Thus, I find there is not a proper basis for taking any more evidence on this issue.

The evidence indicates that in 1986 Caruana was either an associate of the Patriarca Family or a proposed member of the Family. He was a fugitive and being helped by members of the Patriarca Family in Connecticut. Caruana's link to the Patriarca Family, however, was then Billy Grasso, who was also known as "The Wild Guy."

In his affidavit, Leonetti claimed LCN rules require the murder of people who get romantically involved with the wife of members. *See, e.g.,* Leonetti Aff. ¶ 10. I doubt that there was such a firm, even stated rule, let alone practice. It is not

mentioned in the induction ceremony, and although Leonetti was experienced in testifying about the rules of the LCN, he never mentioned this purported rule previously. *See* Exhibit 4B, Tr., October 29, 1989. However, this fact is not material.

I am satisfied that it appears for present purposes that Caruana killed Berns because Caruana believed that Berns had been involved with his wife. I am also satisfied that Grasso and his associates helped bury Berns' body. *See* Government's Factual Submission Concerning Relevant Conduct, Exhibit E, Castagna Test., June 10 and 11, 1991.

The government has not, however, proven by a preponderance of the evidence, that the defendant was consulted, or authorized Grasso's participation. The government has not shown that the defendant was involved in any way. Therefore, the government has not shown that the defendant was criminally responsible for the Berns' murder.

More specifically, while many people were charged with complicity in the Berns' murder in the *Bianco* case in Connecticut, the defendant was not. As described earlier, if the LCN had general rules that the Boss was supposed to be consulted regarding murder, that rule was not followed in the Patriarca Family while this defendant was the Boss. This so-called rule was particularly not followed, I find, with regard to Berns.

Castagna in his affidavit characterized Grasso as very secretive. *See* Castagna Aff. ¶ 3. He claims that Grasso acknowledged he was supposed to report to the defendant. *Id.* However, the Bruno incident I described earlier, testified to by Leonetti, shows that Grasso was out of control and that the defendant particularly could not control him. *See* Leonetti Test., May 18, 1992; *see also* Leonetti Aff. ¶ 4. In his testimony in the *Bianco* case, Castagna confirmed this. *See* Government's Factual Submission Concerning Relevant Conduct, Exhibit E, Castagna Test., May 15, 1991, Afternoon Session, pp. 15–16. Castagna cooperated with the government and testified in the *Bianco* case that Grasso was

acting crazy, and he wanted to kill everyone in sight. *Id.*

Once again, there is no electronic surveillance even suggesting that the defendant was consulted concerning the Berns murder or authorized it. Nor has any confidential informant made known to the Court claimed that the defendant was consulted about the murder.

Although I am not relying on this, I note that its appears that Gaetano Milano, a soldier of the Patriarca Family under Grasso, who was convicted in the *Bianco* case may now be cooperating with the government. The government has offered no evidence from Milano, but only furnished statements from Castagna concerning purported comments of Milano.

\* \* \* \* \* \*

Once again, in comparison with the *Cammisano* case, the evidence regarding the defendant's involvement in the Berns murder is insufficient to justify the taking of any further testimony or to hold the defendant liable in this sentencing for that offense. *Cammisano*, 917 F.2d at 1060–62.

This decision does not mean, to put it colloquially, that "the defendant is getting away with murder." The government has confirmed in these proceedings that the State of Connecticut, and probably the United States government, could still subject Patriarca to prosecution for the Berns murder. This sentencing is not the only potential opportunity to punish Patriarca for his alleged involvement in that crime. This is not material to the factual and legal decisions I have made, but it relates to the practical consequences of them. If there is a prosecuting authority that wishes to see the defendant punished for the Berns murder, and believes there is a proper basis to obtain an indictment, he can be indicted. He could be tried before a jury. The rules of evidence would apply. If he is proven guilty of the Berns murder beyond a reasonable doubt, the prosecuting authority could then seek an appropriate sentence for that offense.

With regard to Carrozza and drugs, the government has also not proven by a pre-

ponderance of the evidence that the defendant conspired with, aided and abetted, or profited from the narcotics activities of Carrozza. *See* Presentence Report, ¶ 101, p. 46; *see also* Government's Proffer of Evidence Concerning Sentencing Hearing, pp. 15–19. Nor has it offered a sufficient basis to justify my hearing testimony or taking further evidence on this.

The defendant was not charged with Carrozza with regard to these crimes. In contrast, Joseph Russo was. *See* Superseding Indictment, Count 51, p. 132. In addition, while the government's Trial Brief was not directed to Patriarca particularly, he was not mentioned in the section concerning the Carrozza drug transactions. *See* Trial Brief of the United States, pp. 184–195.

As I described earlier, the LCN generally and the defendant particularly, had a stated rule against direct drug dealing by made members. *See supra*, pp. 182–83. Carrozza's activities violated this purported rule.

As I also described, the government did not prove by a preponderance of the evidence that the defendant was told by Carrozza about Carrozza's desire to traffic in drugs with Covello in connection with the 1985 Travel Act violation. In addition, the extensive electronic surveillance did not indicate the defendant was involved in Carrozza's other drug dealing or profited from it.

I have read carefully DeMarco's affidavit to determine whether I ought to receive testimony from him. *See* DeMarco Aff. Each of the affiants has been less strong from the government's point of view once they have had to testify. However, I have read the affidavit of this cooperating individual and find that even if everything in it were true, it would not, in the circumstances, suffice to persuade me that Patriarca should be held responsible for Carrozza's drug dealing for the purposes of § 4A1.3. *Id.*

More specifically, even assuming that DeMarco's affidavit is reliable, his statements are insufficient to prove in the circumstances that Carrozza shared any profits from his narcotics activities with the defendant. DeMarco claims that Carrozza said he gave the defendant money. *Id.* ¶ 6. The one specific example in his affidavit relates to money from the Mantia extortion, which was the subject of the 1985 travel, which is Count 31. *Id.*

Also in the carefully worded affidavit, it was suggested that Carrozza was supposed to pay the defendant regarding all his crimes, including drugs. *Id.* ¶¶ 4; 6. However, I have found extensive evidence that the Boston faction, including Carrozza, hid some of their activities, like the Vanessa's extortion, from the defendant. In these circumstances DeMarco's affidavit is insufficient, even if accepted as fully truthful and accurate, to prove the defendant's complicity with Carrozza in his drug dealings.

With regard to the alleged authorization by the defendant of an attempt to murder Ferrara, with regard to bail I decided that the defendant had not then been shown to have authorized a hit on Ferrara because of the belief that Ferrara was cooperating with the government. *Patriarca*, 776 F.Supp. at 602. At this point, the government's burden of proof is lower; it is proof by a preponderance of the evidence and not by clear and convincing evidence as it was with regard to bail. *See* 18 U.S.C. § 3142(f). In addition, the government has offered more evidence on this subject. Nevertheless, the government has again failed to prove the defendant authorized an attempt to murder Ferrara. It has also not offered information sufficient to warrant taking additional evidence on this subject.

The government relies primarily on the affidavit of John Castagna, who claims that Milano said that Grasso believed Ferrara was cooperating with the government. *See* Government's Factual Submission Concerning Relevant Conduct, Exhibit B, Castagna Aff. ¶¶ 5–6. The Castagna Affidavit asserts that Milano said that with the knowledge and approval of the defendant, Grasso intended to kill Ferrara. Russo and Ferrara, along with Carrozza, apparently caused Grasso to be killed in order to save Ferrara's life. *Id.*

However, the Castagna Affidavit and other evidence is insufficient to establish

the matters alleged concerning the so-called Ferrara "hit." The claim that the defendant authorized a murder or "hit" on Ferrara goes beyond Castagna's testimony in the *Bianco* case. *See* Exhibit 24, Castagna Test., May 15, 1991, Afternoon Session, p. 15. In that case, Castagna was asked who allegedly put out a contract on Vincent Ferrara. Castagna's response was: "Billy Grasso, supposedly with Raymond Patriarca." *Id.*

Castagna evidently has no personal knowledge about this matter. He relies on what Milano purportedly said. I do not find that, given Castagna's lack of personal knowledge, his affidavit contains sufficient indicia of reliability to be relied on to prove that any hit on Ferrara was contemplated and, particularly, that the defendant authorized any such hit.

Once again, although this analysis does not depend on this in any way, I have not heard anything from Milano on this subject. In addition, there is no electronic surveillance indicating that the defendant authorized a hit on Ferrara. There is circumstantial evidence that the government did not believe there was a threat to Ferrara's life. Although it had extensive and impressive information of what was going on in the Patriarca Family in this period, the government did not warn Ferrara of any danger, as it warned Patriarca when he was in danger. So, as a year ago in my bail decision, I find that although Ferrara, Russo and Carrozza may have sincerely believed that Ferrara was in jeopardy, the government has not proven that any hit on Ferrara was actually planned or that the defendant authorized any murder attempt that Grasso was contemplating. *See Patriarca*, 776 F.Supp. at 602.

The last item is the contention that the defendant should now be held responsible for the harboring of Alphonse Persico. *See* Presentence Report, p. 6, n. 1; Government's Proffer of Evidence Concerning Sentencing Hearing, pp. 20–21. Essentially, the assertion is that members of the Patriarca Family harbored this fugitive Underboss of the Colombo LCN Family from 1980 to 1987. The government claims that the defendant is criminally responsible for this because the harboring of a member of one Family by another Family could not have occurred without consultation between the Bosses of the two Families. This is based on Leonetti's testimony relating to the LCN rules. *See* Leonetti Test., May 18, 1992; *see also* Leonetti Aff. ¶ 6.

If there was such a rule about the Bosses consulting, I am persuaded it was not always followed in the Patriarca Family under the defendant. For example, Carrozza dealt drugs with Covello without the Bosses consulting. Similarly, Bruno approached the defendant directly concerning his dispute and did not have his Boss contact Patriarca.

The government's proffer does not suggest to me that there is any evidence that the defendant was personally involved in harboring Persico. Indeed, the Boss of the Family for most of the relevant period—5 of the 7 years—was the defendant's father. Thus, it is not appropriate to punish this defendant now for harboring Persico.

Accordingly, only the defendant's involvement with Caruana has been proven by a preponderance of the evidence. This raises his Criminal History Category from I to II.

█ The only other argument for departure essentially is that the defendant should be held accountable for all the crimes of the Patriarca Family that occurred while he was the Boss. This would be inconsistent with the decision of the Sentencing Commission defining the Base Offense Level for RICO offenses in § 2E1.1 of the Guidelines. In any event, it would be inappropriate based on the specific facts proven in this case.

Thus, as I have said, I find the defendant's Guidelines to be an Offense Level 27, with a Criminal History Category of II. Therefore, the defendant must be sentenced to 78 to 97 months; two to three years of supervised release; a fine of $12,500 to $125,000, plus the cost of his confinement of $98,122 to $122,344, depending on how long he is incarcerated, and the cost

of the supervision; and a $350 special assessment.

\* \* \* \* \* \*

Accordingly, on June 17, 1992, after the Court denied the government's motion to reconsider its rulings regarding the Presentence Report, the defendant Raymond J. Patriarca was sentenced to:

(1) Serve 97 months in the custody of the Attorney General of the United States;

(2) Pay a fine of $50,000, plus the costs of his confinement in the amount of $122,344, and the costs of his supervision in the amount of $3,954;

(3) Serve three years on supervised release, subject to the standard conditions and certain special conditions; and

(4) Pay a mandatory $350 special assessment.